*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RONNIE DUNN and KEVIN ROSS,

      Plaintiffs-Appellants,

and

CHARLES BLUE and CLINT BECK,

      Plaintiffs,

v

GENESEE COUNTY ROAD COMMISSION,

      Defendant-Appellee.

UNPUBLISHED
August 1, 2019

Nos. 341907; 341908
Genesee Circuit Court
LC No. 13-100253-CD

Before: O'BRIEN, P.J., and FORT HOOD and CAMERON, JJ.

PER CURIAM.

In Docket No. 341907, plaintiffs, Ronnie Dunn and Kevin Ross,[1] appeal as of right an order awarding defendant, the Genesee County Road Commission, $46,645.50 in attorney fees as case-evaluation sanctions after the jury returned a verdict of no cause of action for plaintiffs' claim of racial discrimination under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*. In Docket No. 341908, plaintiffs appeal by leave granted an order denying their motion for a new trial. We affirm in Docket No. 341908. In Docket No. 341907, we affirm in part and remand, while retaining jurisdiction.

## I. BACKGROUND FACTS

---

[1] There were, originally, additional plaintiffs in this case. Their claims were dismissed and are not at issue in this appeal. The term "plaintiffs" in this opinion refers to Dunn and Ross.

Plaintiffs, both black men, were equipment operators in the maintenance department at the Road Commission and, in 2012, applied for an opening for a maintenance-foreman position at defendant's Swartz Creek garage. Defendant's maintenance director, Anthony Branch, recommended plaintiffs and seven other applicants for interviews. John Daly, who was in charge of final hiring decisions for defendant, interviewed five of the nine persons recommended by Branch: two white male equipment operators from the maintenance department, two white males from the engineering department, and one black female from the engineering department. He did not interview plaintiffs. Daly ultimately hired Mike Jaeger, one of the white males from the engineering department, for the job. Plaintiffs filed suit on April 12, 2013, alleging race-based discrimination under the ELCRA.[2] Originally, the trial court granted defendant's motion for summary disposition, concluding that defendant's provided reasoning for its hiring process was not a pretext for discrimination. On appeal, this Court reversed because "there were questions of fact for the jury . . . ." *Dunn v Genesee Co Rd Comm*, unpublished per curiam opinion of the Court of Appeals, issued February 2, 2016 (Docket Nos. 323739 and 323779), p 12.

Plaintiffs' primary theory at the ensuing trial was that they were more qualified than Jaeger for the Swartz Creek position because they knew how to operate heavy equipment and Jaeger, with his background in engineering, did not. Defendant moved for a directed verdict at the close of testimony. The trial court grudgingly denied it, stating that multiple witnesses had averred that Daly never exhibited any signs of racial animosity, had worked closely with and hired many black individuals, and simply had preferred an engineer—not an equipment operator—to be the foreman at the Swartz Creek garage. The court stated that any evidence of racial discrimination was "as thin as it gets" but that it would let the jury decide the issue. The jury found no cause of action with regard to each plaintiff.

On appeal, plaintiffs contend that the trial court failed to follow this Court's directive from the earlier appeal when it refused to instruct the jury about defendant's failure to *interview* plaintiffs and instructed only about the failure to *promote* them. They also take issue with various aspects of the court's assessment of case-evaluation sanctions.

## II. DOCKET NO. 341907

## A. APPLICABILITY OF CASE-EVALUATION SANCTIONS IN AN ELCRA CASE

Plaintiffs contend that the court should not have assessed case-evaluation sanctions against them because their lawsuit was based on the ELCRA. They claim that they were attempting to obtain not just monetary damages but social relief, and that encouraging them to accept a pretrial monetary settlement by way of the case-evaluation scheme is inappropriate as a matter of public policy.

---

[2] Plaintiffs also raised a claim of retaliation. This claim was dismissed and is not at issue in the present appeal.

This issue is primarily one of law, and this Court reviews questions of law de novo. *DeCosta v Gossage*, 486 Mich 116, 122; 782 NW2d 734 (2010).

MCR 2.403(A)(1) states, "A court may submit to case evaluation any civil action in which the relief sought is primarily money damages or division of property."[3] MCR 2.403(2) states, "Case evaluation of tort cases filed in circuit court is mandatory beginning with actions filed after the effective dates of Chapters 49 and 49A of the Revised Judicature Act, as added by 1986 PA 178." In *Severine v Ford Aerospace & Communications Corp*, 118 Mich App 769, 770, 776-777; 325 NW2d 572 (1982), disapproved of on other grounds by *Sutherland v Kenningon Truck Serv*, 454 Mich 274; 562 NW2d 466 (1997), the plaintiff filed a claim under the ELCRA, and this Court, in analyzing a choice-of-law dispute, stated that the "plaintiff's claim of employment discrimination is in the nature of a tort action" and referred to the defendant's "alleged tortious conduct."

Plaintiffs' ELCRA claim proceeded to case evaluation, which resulted in a proposed award of $40,000 for each plaintiff. Plaintiffs and defendant rejected the proposed award. Given the jury's finding of no cause of action, MCR 2.403(O)(1) provides for an award of costs to defendant as case-evaluation sanctions. Costs include "a reasonable attorney fee[.]" MCR 2.403(O)(6)(b).

The record suggests that plaintiffs accepted the possibility that they could be liable for case-evaluation sanctions, if applicable. MCR 2.403(C) sets forth a procedure to follow if one objects to having a case submitted to case evaluation. MCR 2.403(C) states:

> (1) To object to case evaluation, a party must file a written motion to remove from case evaluation and a notice of hearing of the motion and serve a copy on the attorneys of record and the ADR clerk within 14 days after notice of the order assigning the action to case evaluation. The motion must be set for hearing within 14 days after it is filed, unless the court orders otherwise.
>
> (2) A timely motion must be heard before the case is submitted to case evaluation.

On June 13, 2016, defendant filed a request to schedule a case evaluation, averring that plaintiffs' civil-rights case sounded in tort. Plaintiffs did not object to case evaluation as being inappropriate in this ELCRA case. In fact, the lower court record contains a *stipulated* order to adjourn trial and schedule a case evaluation. By acquiescing to the submission of the case to case evaluation, plaintiffs implicitly acquiesced to pay costs to defendant if warranted under the case-evaluation rules. A party may not claim as error on appeal something to which the party

---

3 Plaintiffs assert that they were seeking, in part, declaratory relief, and this is true. In the second amended complaint, they asked for a declaration that "the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of the [ELCRA]." However, a fair reading of the complaint as a whole shows that the primary relief sought was money damages.

acquiesced in the trial court. *In re Conservatorship of Brody*, 321 Mich App 332, 347; 909 NW2d 849 (2017).

We note, too, that in *Meyer v City of Center Line*, 242 Mich App 560, 563; 619 NW2d 182 (2000), the plaintiff filed suit under the ELCRA and the jury returned a verdict of no cause of action. This Court affirmed sanctions against the plaintiff under MCR 2.403(O). *Id*. at 577. This Court also affirmed case-evaluation sanctions against the plaintiff in an ELCRA case in *Hyde v Univ of Mich Regents*, 226 Mich App 511, 526; 575 NW2d 36 (1997). See also *Dresselhouse v Chrysler Corp*, 177 Mich App 470, 484; 442 NW2d 705 (1989). While the panels in these cases were not addressing the precise argument being made by plaintiffs (that it violates public policy and the spirit of the ELCRA to assess case-evaluation sanctions against a civil-rights plaintiff), the cases provide tangential support for defendant's position.

Plaintiffs assert that the fee-shifting provision of the ELCRA and the case-evaluation court rules are in conflict and that the ELCRA, as a statute enacted by the Legislature, must prevail. But the fee-shifting provision in the ELCRA states only the following:

> A court, in rendering a judgment in an action brought pursuant to this article, may award all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, to the complainant in the action if the court determines that the award is appropriate. [MCL 37.2802.]

To be awarded fees under this statute, a party must be a prevailing party. *Meyer*, 242 Mich App 576. "To be considered a prevailing party, a plaintiff must receive at least some relief on the merits of plaintiff's claim, such as an award of damages, an injunction, or a declaratory judgment on a favorable consent decree or settlement." *Id*. Plaintiffs obtained no relief at all by way of their lawsuit. They were clearly not prevailing parties, and therefore under the facts of the present case there is no conflict between MCL 37.2802 and the case-evaluation court rules because plaintiffs could not obtain costs under the statute.

Plaintiffs also cite the statement from *Young v Barker*, 158 Mich App 709, 726; 405 NW2d 395 (1987), that "the prevailing defendant in a civil rights case may recover attorney fees only if the trial court, in its discretion, determines that the suit was vexatious, frivolous or brought to harass." The *Young* panel was not discussing the ELCRA in particular. In addition, the *Young* panel was discussing general attorney-fee awards in civil-rights actions and was not dealing with the specific case-evaluation scheme, which is a scheme to encourage settlement. See *Smith v Khouri*, 481 Mich 519, 527-528; 751 NW2d 472 (2008). Obtaining a settlement in a civil-rights case would further the social-justice goals mentioned by plaintiffs just as a favorable jury verdict would. See, e.g., *Varney v Genesee Co Sheriff*, 156 Mich App 539, 543-544; 402 NW2d 57 (1986) (mentioning that civil-rights claims are not on a different footing from other civil claims in terms of settlement issues and that encouraging settlement of such claims does not deter people from bringing suit).[4] The Michigan Supreme Court has mentioned that it is "the

---

[4] Plaintiffs cite *Hescott v Saginaw*, 757 F3d 518 (CA 6, 2014), which dealt with a federal civil-rights claim and a federal settlement rule—FR Civ P 68—that is analogous in some respects

-4-

existing policy of this Court to encourage settlements when feasible." *Brewer v Payless Stations, Inc*, 412 Mich 673, 679; 316 NW2d 702 (1982).

Considering all the circumstances, plaintiffs have not demonstrated that the trial court erred by applying the case-evaluation court rules to their ELCRA claim.

## B. SUPPORT FOR AND REASONABLENESS OF THE AWARD

Plaintiffs contend that the amount of the attorney-fee award was unreasonable and unsupported, and point to several alleged errors by the trial court. The decision to award case-evaluation sanctions is reviewed de novo, but "[t]he amount of case evaluation sanctions awarded is reviewed for an abuse of discretion." *Ayre v Outlaw Decoys, Inc*, 256 Mich App 517, 520; 664 NW2d 263 (2003). Some of plaintiffs' arguments, however, are unpreserved. This Court reviews unpreserved issues for plain error affecting substantial rights. *Demski v Petlick*, 309 Mich App 404, 426-427; 873 NW2d 596 (2015). A plain error is one that is "clear or obvious[.]" *Id*. at 427 (quotation marks and citations omitted).

### 1. AFFIDAVIT REQUIREMENT

Plaintiffs take issue with the fact that defendant's two attorneys did not submit any affidavits in support of their claimed hours of work. However, plaintiffs did not raise this issue below. In the trial court, with regard to the affidavit issue, plaintiffs stated only that counsel did not submit any affidavits in support of the requested *hourly rate*. Thus, plaintiffs' argument that affidavits were needed to support the claimed *number of hours expended* is unpreserved.

In support of their argument, plaintiffs cite only unpublished Michigan cases.[5] For this reason alone, plaintiffs have failed to establish a "clear or obvious" error, *Demski*, 309 Mich App

---

to the Michigan case-evaluation-sanctions scheme. Plaintiffs point out that, in *Hescott*, the federal court stated, as part of its reasoning for denying the defendant an award of sanctions, that a civil-rights defendant can only recover attorney fees under the civil-rights statute in issue—42 USC 1988—if it is the prevailing party and the plaintiff's action was frivolous. See *id*. at 529. But this federal case, while potentially useful as persuasive authority, see *Dresselhouse*, 177 Mich App at 484, is not binding with regard to plaintiffs' state-law claims. In addition, the case is not on all fours with the present case because the plaintiff in *Hescott* was a prevailing party, and the *Hescott* Court held that FR Civ P 68 "cannot force a prevailing civil-rights plaintiff to pay a defendant's post-offer attorneys' fees." *Id*. at 528-529.

[5] Plaintiffs cite one published *federal* case, *Blum v Stenson*, 465 US 886; 104 S Ct 1541; 79 L Ed 2d 891 (1984), but do not explain why this federal case should be binding with regard to case-evaluation sanctions based on state law. In addition, the Court in that case discussed the production of affidavits to support requested *rates*. *Id*. at 895 n 11. The Court stated that "the critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate." *Id*. The parties here stipulated to a rate of $165 an hour.

at 427, with regard to the trial court's calculation of sanctions based on defense counsel's billing statements and oral arguments. In addition, one of the defendant's attorneys signed the motion in which he set forth the claimed amount of $54,037.50 for the defense, noting that "[a]n itemization" was "attached as Exhibit 1," and the statements were indeed attached. The same defense counsel, in open court, referred to the request for "$54,000" in fees. Under these circumstances, the trial court had sufficient proofs to analyze the fee issue. See *Smith*, 481 Mich at 528-529 ("[T]he burden of proving the reasonableness of the requested fees rests with the party requesting them.").

## 2. TWO ATTORNEYS

Plaintiffs claim that "despite [their] objection, the trial court sanctioned [plaintiffs] for duplicative billing for seemingly-identical tasks being performed by two separate attorneys." Plaintiffs do not indicate with specificity what these "seemingly-identical tasks" were. A reasonable inference, however, is that plaintiffs are taking issue with the fact that the defense billed for defense attorney Wendy Hardt's attendance at trial, even though it was Thomas Derderian who performed the on-the-record work.

The trial took place on June 13, 14, 15, 16, and 19 of 2017, and the defense billed for both attorneys' attendance at trial for the first four days only.[6] The court found the trial-attendance billings for June 13, 14, and 16 reasonable. For the billing statement encompassing the trial dates of June 13 and 14, it stated, "The [c]ourt has no concerns regarding trial and travel time and intra-trial week preparations. These are skilled counsel and, as such, it is commonly known that work does not end when the courtroom lights are dimmed." For the billing statement encompassing the trial date of June 16, it again stated, "[T]he [c]ourt finds reasonable trial and travel time and much of the intra-trial week preparation." However, the court reduced the defense's claimed billings for the trial date of June 15. For that date, the defense had claimed 10.5 hours for Hardt to attend trial, 10.5 hours for Derderian to defend at trial, and 2.8 hours for Derderian to prepare for the fourth day of trial. The court stated, "The [c]ourt reduces by 10.5 hours those entries as apparently simply a double counting." This statement by the court is perplexing, because the court did not characterize the billings for June 13, 14, and 16 as "a double counting," even though fees were sought for both attorneys' attendance at trial on those dates, too.[7] In addition, the transcript for June 15 shows that both attorneys were present for trial. Because the trial court's reasoning is inconsistent, we remand

---

We also note that the primary unpublished Michigan case relied upon by plaintiffs is factually distinguishable in that it involved an unsupported, sudden increase in requested fees and an absence of billing statements. Such circumstances were not present here.

[6] The last day of trial encompassed closing arguments and jury instructions, but no taking of testimony.

[7] Defendant mentioned both attorneys when seeking fees and attached both attorneys' resumes to its motion for fees, and the billing statements themselves delineated, using initials, which attorney was billing for which hours.

this case, while retaining jurisdiction, to allow the court to explain why it characterized the billings for June 15 as a "double counting," when it did not do so for the other trial dates.

We also note that in *Smith*, 481 Mich at 534, the Supreme Court directed the trial court in that case to consider whether it was "reasonable for plaintiff's firm to have two lawyers 'on the clock' during the trial." The trial court in the present case did not make a specific finding regarding this factor and must do so on remand.

### 3. "BLOCKS OF TIME"

Citing a federal district court case that was not reported in the Federal Supplement, plaintiffs claim that the trial court impermissibly approved of defense counsel's use of large blocks of time in its billing statements. Plaintiffs claim that these allegedly large blocks of time made it impossible to determine the reasonableness of the billings. But plaintiffs point to no specific billings in making this complaint. An appellant may not leave it up to this Court to unravel his arguments for him. *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 499; 668 NW2d 402 (2003). In their response to defendant's motion for attorney fees in the trial court, plaintiffs *did* point to a specific billing. They stated that for June 13, 2017, Derderian spent 11 hours meeting with Branch and representing defendant at trial, and they complained that it was not clear "how many hours were attributed to each task." But the trial court presided over the trial, so it could easily ascertain how many hours the trial encompassed on June 13. Plaintiffs' argument about the use of "large blocks of time" is not a basis for any appellate relief.

### 4. DISMISSED PARTIES

Plaintiffs claim that the trial court allowed fees for work pertaining to dismissed parties, Charles Blue and Chip Beck. The billing statement shows this work took place on November 11, 2016. For that date, defense counsel listed 6.5 hours for: "Trial preparation; telephone conference with Rachel Mullin; review deposition transcript of Charles Blue and Chip Beck; prepare examination of Charles Blue and Chip Beck." The trial court approved this billing, making note of the 6.5 hours spent for "trial preparation/deposition review." It stated that the hours claimed were significant yet reasonable, noting that "[c]ounsel was supremely prepared and effective." Plaintiffs claim that counsel failed to show that any review of Blue's or Beck's deposition, or any examination of them, was needed to defend against plaintiffs' case. Yet it is reasonable to infer that such work—which was only part of the claimed 6.5 hours—was necessary, given that Blue and Beck were originally plaintiffs in the case and were making similar claims to those of Dunn and Ross. That counsel did not, in the end, call Blue or Beck as witnesses is not dispositive with regard to the preparatory work involved. The trial court did not err by approving this or any other billings involving Blue or Beck.

### 5. ADJOURNMENTS

Trial in this case was adjourned twice. The defense's billing statements show that the defense billed for 96 hours up to the day-of-trial adjournment on December 7, 2016, an additional 78.4 additional hours up to the second day-of-trial adjournment on March 28, 2017, and an additional 153.1 hours through the end of the case. Plaintiffs contend that the additional

hours that the defense billed after the adjournments were unreasonable because it was for work that had already been completed.

The trial court addressed plaintiffs' claims of redundancy. It noted that the case file was large and required renewed review after adjournments, but it reduced by one hour the claimed time for preparing an opening statement on March 13. For additional billings after the December 7 adjournment but before the March 28 adjournment, the court stated, in part:

> Of concern to the [c]ourt, in light of [p]laintiffs' position, are some 17 hours' worth of time concerning deposition review and testimony preparation. To the [c]ourt on the information presented, some of this time seems excessive and/or duplicative. A balance, however, is needed. Some work had been performed on the case in mid-March to a much lesser degree. Skilled counsel, like defense counsel, certainly has the ability to quickly return to speed on a case with far more than average retention abilities. Accordingly, the [c]ourt sustains in part [p]laintiffs' contention and reduces the 67.8 hours to 52.0 hours, finding that amount of time reasonable for the tasks listed. The [c]ourt is especially focused on the length of the phone conversations involved.

With regard to the additional billings before the start of trial on June 13, the court stated:

> Plaintiffs' arguments gain further traction regarding [d]efendant's June 15, 2017 invoice for services, which lists some 83 hours, over a time period of 23 days, with 13 entries. . . . [T]he [c]ourt does have some concerns about the entries for deposition review, client and witness meetings, and phone conversations. By the [c]ourt's count, some 25 hours were spent on these matters without much in the way of particularization. The [c]ourt reduces these hours by 8. Moreover, a June 12, 2017 entry for 7 hours also seems not fully warranted. While some time had to be presented to prepare for [p]laintiffs' "damages" expert, 7 hours is high, especially given the rest of the block entry seems repetitive. The [c]ourt reduces the request by 3 hours, finding the reduced hours to be reasonable.

The court also reduced by 2.5 hours the additional time claimed for after the start of trial.[8]

We find no abuse of discretion concerning the court's approach to this issue. As the court noted, "[S]ome repetition is needed when trials get rescheduled." It is unreasonable to assume that counsel, once prepared for trial, would simply remain prepared throughout the ensuing months. That refreshing of the issues would be needed or additional areas for exploration might arise is not unusual, and the court *did* reduce some of the claimed hours. We find no basis for reversal.

## 6. INTEREST-OF-JUSTICE EXCEPTION

---

[8] The court also reduced the claimed time by 10.5 hours for "a double counting" as discussed above in the analysis of plaintiffs' "two attorneys" arguments.

Plaintiffs argue that the trial court should have employed the interest-of-justice exception to case-evaluation sanctions. Plaintiffs have established no plain error with regard to this unpreserved argument. MCR 2.403(O)(11) states, "If the 'verdict' is the result of a motion as provided by subrule (O)(2)(c), the court may, in the interest of justice, refuse to award actual costs." MCR 2.403(O)(2) states:

> For the purpose of this rule "verdict" includes,
>
> (a) a jury verdict,
>
> (b) a judgment by the court after a nonjury trial,
>
> (c) a judgment entered as a result of a ruling on a motion after rejection of the case evaluation.

The "verdict" here fell under subrule (O)(2)(a), not (O)(2)(c). Thus, there is no clear or obvious error, *Demski*, 309 Mich App at 427, concerning the trial court's failure to apply MCL 2.403(O)(11).

## C. JOINT SANCTIONS

Plaintiffs claim that Dunn and Ross had different qualifications for the foreman position and different damages calculations as testified to by an economics expert, and therefore defendant had to tailor its defenses for each plaintiff. They claim that a plaintiff who is being assessed case-evaluation sanctions is only responsible for fees associated with the defense against that plaintiff's theories of liability and evidence of damages, and that the court erred by assessing case-evaluation sanctions jointly.

This issue—whether the court could issue one case-evaluation award against two plaintiffs—is primarily an issue of law. This Court reviews de novo issues of law. *DeCosta*, 486 Mich at 122.

Plaintiffs rely on *Ayre*, 256 Mich App 517, for their argument. In that case, a jury trial resulted in a verdict of no cause of action against Attwood Corporation for their allegedly defective manufacturing of a fuel-system component for a boat. *Id*. at 519. Of the four plaintiffs, three had accepted the pretrial case-evaluation awards, but one—Susanne Burnside—had rejected it. *Id*. The trial court imposed case-evaluation sanctions against Burnside, which she challenged. *Id*. at 520. This Court explained:

> The issue here . . . is the scope of one rejecting plaintiff's liability, by operation of MCR 2.403(O), in a multiple-plaintiff action, when the defendant prevailed against all the plaintiffs. *Is the rejecting plaintiff liable for all of a defendant's attorney fees that accrued after case evaluation, including those associated with defending against the claims of the other plaintiffs that were also litigated in the same trial? The answer is no.* The rejecting plaintiff is only liable for those attorney fees that accrued as a consequence of that plaintiff's rejection,

which is determined by examining the rejecting plaintiff's theories of liability and damage claims. [*Id*. at 522 (emphasis added).]

The *Ayre* Court went on to discuss the attorney fees associated with the theory of liability, stating:

> The rejecting plaintiff is only liable for attorney fees associated with the defense against that plaintiff's theories of liability. If coplaintiffs asserted different theories of liability than the rejecting plaintiff, only the attorney fees associated with the defense against the rejecting plaintiff's theories of liability are taxable. On the other hand, *if all the plaintiffs asserted the same theory of liability, the rejecting plaintiff is liable for the attorney fees associated with the defense against that theory of liability*. Here, all the plaintiffs asserted the same theory of liability—Attwood manufactured a defective fuel system component. Therefore, the attorney fees defendant incurred following case evaluation with regard to the liability component of its defense—disproving that its fuel system component was defective—are recoverable as case evaluation sanctions against the sole rejecting plaintiff, because that is the risk plaintiff assumed by rejecting the case evaluation award. [*Id*. at 522-523 (emphasis added).]

The *Ayre* Court then indicated that the theory of liability is only one-half of the analysis, stating that the issue of damages also needed to be considered:

> However, the analysis does not end with consideration of the liability component of the litigation—the damages component must also be considered. The attorney fees associated with defending against the rejecting plaintiff's alleged damages must also be determined. *The damage claims asserted by plaintiffs, especially in personal injury and wrongful death causes of action, are necessarily as unique as each plaintiff in the cause of action. Accordingly, the rejecting plaintiff is only liable for the attorney fees incurred by the defendant in defending against the damages component of that plaintiff's case.* Here, plaintiff is not liable for the attorney fees defendant incurred defending against her coplaintiffs' damage claims because defendant assumed that risk by rejecting those case evaluation awards.
>
> *The net result of our analysis, then, is that the rejecting plaintiff is only liable for the attorney fees the defendant incurred, following case evaluation, defending against the rejecting plaintiff's case only, as if the plaintiff and the defendant were the only litigants in the cause of action.* One of the virtues of this result is its versatility. For example, *when more than one rejecting plaintiff is liable for a defendant's attorney fees, the attorney fees associated with defending against a single theory of liability would be divided equally between the liable plaintiffs, but each plaintiff would be responsible for the attorney fees associated with defending against their individual damage claims.* However, rejecting and liable plaintiffs who pursued different or additional theories of liability would be solely liable for the defendant's attorney fees associated with defending against their unique theories of liability, as well as for the fees associated with defending

-10-

against their individual damage claims. Similarly, when only some of the defendants in a multiple-defendant case are entitled to case evaluation sanctions, isolating each of the rejecting plaintiffs' cases, i.e., theories of liability and damage claims, permits the proper allocation of liability. Considering each liable plaintiff's case separately also ensures that liability is fairly allocated and simplifies the complicated and arduous task of calculating attorney fees—other virtues of this analysis. [*Id*. at 523-524 (emphasis added).]

The *Ayre* Court summarized its holding as follows:

In summary, under MCR 2.403(O), a rejecting plaintiff who is liable for a defendant's attorney fees is only liable for those fees that accrued after the case evaluation as a consequence of defending against the rejecting plaintiff's theories of liability and damage claims. In this case, plaintiff was ordered to pay all of Attwood's attorney fees that accrued after the case evaluation without regard to whether some of the fees were incurred defending against the coplaintiffs' damage claims. Accordingly, we vacate the order and remand for reconsideration in accordance with this opinion. [*Id*. at 529-530.]

The *Ayre* Court stated that cases should be analyzed as if the "party [liable for sanctions] and the prevailing party were the only two litigants following the case evaluation[.]" *Id*. at 529.

*Ayre* instructs that a court, in multiple-plaintiff cases, assess the theories of liability and the claims for damages in determining case-evaluation awards. Plaintiffs contend that Dunn and Ross had different theories of liability because they each had to demonstrate, separately, how they were qualified for an interview and better-qualified for the foreman position than Jaeger. Plaintiffs also contend that the damages evidence for each plaintiff was separate. Plaintiffs' arguments are persuasive. The theory of liability in *Ayre*—the manufacture of a defective fuel-system component—was a "singular" and uniform theory that would be *identical*—and require an identical defense—no matter which plaintiff espoused the theory. The present case is different because each plaintiff was proposing that he was qualified in an individualized manner to be interviewed and hired for the foreman position. In addition, different damages calculations were made for each plaintiff. For example, at one point defense counsel questioned plaintiffs' economics expert specifically about Ross's financial statements and not about Dunn's. With regard to damages, the *Ayre* Court noted that "damage claims" are "as unique as each plaintiff in the cause of action." *Id*. at 523.

The *Ayre* Court stated, "[W]hen more than one rejecting plaintiff is liable for a defendant's attorney fees, the attorney fees associated with defending against a single theory of liability would be *divided equally* between the liable plaintiffs, but each plaintiff would be responsible for the attorney fees associated with defending against their individual damage claims." *Id*. at 524. Here, based on the substantial similarity between Ross's and Dunn's theories of liability and damages claims, it is tempting simply to indicate that the trial court's fee award should be divided equally, because defendant would likely have spent an equal amount of time on each plaintiff's claim. But this is largely a fact-based determination based on the evidence and defenses at trial, and it is a decision for the trial court—not this Court—to make in the first instance. In addition, the trial court stated in its order that plaintiffs could " 'figure . . .

-11-

out' " which plaintiff should pay which portion of the award, and defendant is now arguing on appeal that the liability for sanctions was joint and several.[9] The award is simply not clear. On remand, the award shall be clarified in accordance with *Ayre*.[10]

### III. DOCKET NO. 341908

Plaintiffs contend that the trial court erred by failing to grant their request to instruct the jury on a "failure to interview" theory of liability instead of instructing them merely about a failure to promote.

This Court reviews claims of instructional error de novo. *Cox ex rel Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 8; 651 NW2d 356 (2002).

A threshold question is whether plaintiffs are correct in asserting that the failure to be interviewed could be the basis for an independent cause of action. In *Laitinen v Saginaw*, 213 Mich App 130, 131; 539 NW2d 515 (1995), the plaintiff had alleged reverse racial discrimination under the ELCRA and the state and federal constitutions, but his case was dismissed for lack of standing. He had obtained an interview for an available position with the city of Saginaw and had the second-highest interview score. *Id*. at 131. However, the city's affirmative-action officer recommended someone else—a black man with a lower score—for the job, and a supervisor recommended the highest-scoring candidate—a white man—as his first choice, with the aforementioned black man as his second choice. *Id*. at 131-132. The black man was hired for the position by the city manager. *Id*. at 132. The trial court concluded that the plaintiff had no standing to sue because even if the black man had not been hired, the highest-scoring man would have been hired instead; the trial concluded that the plaintiff could therefore demonstrate no injury to him based on the defendant's conduct. *Id*. at 133.

This Court disagreed, stating:

> *A claim of unlawful discrimination may be based upon loss of equal employment opportunity as well as loss of employment.* Here, for example, plaintiff might establish that he was personally deprived of equal employment opportunity to the extent that minority job candidates were accorded preferential

---

[9] At the attorney-fee motion hearing, after noting that the final attorney-fee amount would be determined at a later date, the court stated that it was "looking like" the attorney-fee award was going to be joint and several because "it was a jointly tried case with one basically similar claim."

[10] The trial court concluded that the sanctions did not need to be apportioned because plaintiffs' attorney insisted on trying the cases together and was willing to figure out how to split any award of damages. The court thus appears to have applied a sort of "waiver" analysis. But merely because plaintiffs' attorney acquiesced to a joint trial and joint award of damages does not mean that he acquiesced to a joint award of case-evaluation sanctions—they are separate considerations. The court's "waiver" analysis is unpersuasive.

treatment in the selection process by virtue of the affirmative action officer's recommendation authority. Proof that another job applicant, one that was more qualified than the plaintiff and also was discriminated against, would have been selected for the job but for the alleged discrimination merely provides a defense to certain types of remedies, such as job instatement or back pay. It does not necessarily establish a lack of standing or a lack of any right of recovery whatsoever, nor does it necessarily defeat plaintiff's ability to establish a prima facie case of discrimination. If the job would have gone to [the highest-scoring man] in any event, plaintiff's entitlement to economic damages would be adversely affected. However, plaintiff might still have a claim for noneconomic damages that he may have suffered, such as mental or emotional distress. Defendant's determination to offer the position to a less qualified candidate because of his race not only foreclosed plaintiff's opportunity to be considered for the available job opening, it also established a precedent that did not bode well for advancement in the future. [*Id*. at 132-133 (citations omitted; emphasis added).]

*Laitinen* establishes that plaintiffs are correct in asserting that loss of an opportunity for a job can be the basis for a discrimination claim under the ELCRA. In *Laitinen*, the issue was alleged racial bias in recommendations made by the affirmative-action officer and the supervisor. Here, the issue (as framed by plaintiffs on appeal) was alleged racial bias in deciding which persons would be interviewed for the Swartz Creek position. Just as with the plaintiff in *Laitinen*, even if Jaeger or another person was going to be ultimately selected for the Swartz Creek position, plaintiffs could potentially obtain noneconomic damages for the mental distress of failing to advance to the next level of the job-selection process merely because of their race. The issue of noneconomic damages was discussed at trial, and in the jury instructions and verdict form.

Given that the failure to be interviewed can be the basis for a discrimination claim, the question becomes whether the trial court erred by failing to give jury instructions on the failure to interview. Plaintiffs' strongest argument in this regard is based on the law-of-the-case doctrine. In *Kalamazoo v Dep't of Corrections*, 229 Mich App 132, 135; 580 NW2d 475 (1998), the Court stated:

The law of the case doctrine provides that if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same. Likewise, a trial court may not take any action on remand that is inconsistent with the judgment of the appellate court. Thus, as a general rule, a ruling on a legal question in the first appeal is binding on all lower tribunals and in subsequent appeals. The law of the case doctrine applies only to questions actually decided in the prior decision and to those questions necessary to the court's prior determination. The rule applies without regard to the correctness of the prior determination. The primary purpose of the rule is to maintain consistency and avoid reconsideration of matters once decided during the course of a single lawsuit. [Quotation marks and citations omitted.]

In the prior appeal, a panel of this Court stated that "view[ing the evidence] in a light most favorable to Dunn and Ross, a rational juror could have concluded that the proffered reasons [for the hiring process] were a pretext and that race was a factor in *defendant's decision to exclude Dunn and Ross from the interview process*." *Dunn*, unpub op at 12 (emphasis added). The panel also stated that "the proper inquiry [for the trial court] involved determining whether reasonable minds could differ on whether Dunn and Ross' race was one factor that played into *defendant's decision to deny them the opportunity to interview* for the foreman position." *Id*. at 12 (emphasis added). We acknowledge that the panel also said that "a rational trier of fact could reasonably conclude that the interviews and *ultimately the foreman position* were given to another person under circumstances that give rise to an inference of unlawful discrimination," *id*. at 10 (quotation marks and citation omitted; emphasis added), and that the circumstances "were sufficient to support that defendant interviewed *and hired* individuals other than Dunn and Ross under circumstances that support an inference of unlawful discrimination." *Id*. at 11 (emphasis added). An overall reading of the opinion, however, reveals that the panel was focusing on the lack of interviews as opposed to the lack of being hired. See *id*. at 5-6, 11-12.

The trial court, after remand, concluded that there was no independent cause of action for the failure to be interviewed, and that this failure was, instead, necessarily connected to the failure to be promoted. This conclusion is contrary to *Laitinen*, *Dunn*, and the law-of-the case doctrine.

Yet this does not mean that plaintiffs were necessarily entitled to the failure-to-interview instruction. A plaintiff's entitlement to a jury instruction depends on the evidence that is ultimately presented at trial. See, e.g., *Camden Fire Ins Co v Kaminski*, 352 Mich 507, 511; 90 NW2d 685 (1958). And even if plaintiffs were entitled to the instruction, the Michigan Supreme Court has stated that instructional error warrants reversal only if the error resulted in so much unfair prejudice that failing to vacate the verdict would be inconsistent with substantial justice. *Cox*, 467 Mich at 8. In making this pronouncement, the Court cited MCR 2.613(A). *Id*. This rule states:

> An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice. [MCR 2.613(A).]

There are a number of elements that, viewed collectively, make us question whether plaintiffs' requested instruction was appropriate, and ultimately lead us to conclude that failing to vacate the verdict would not be inconsistent with substantial justice. First, even though this Court in *Dunn*, unpub op at 5, referred to plaintiffs' having brought the case based on the "den[ial] . . . [of] the opportunity to interview for the foreman position," a review of the second amended complaint reveals that, under the pertinent "count," plaintiffs specifically referred not

to the failure to be interviewed but to the failure to be promoted.[11]  Second, the jury instructions proposed by plaintiffs before trial were for the failure to be interviewed,[12] and on appeal plaintiffs affirmatively assert that "it was the denial of the interview because of race that was the adverse [employment] action being challenged."  But despite plaintiffs' request to assert a cause of action based solely on the failure to be interviewed, plaintiffs (1) early in the case were preparing for economic-damages testimony based solely on the economic damages that resulted from their not being promoted; and (2) were continuing to prepare for this economic-damages evidence even after this Court's earlier opinion, as demonstrated by documents referring to economic-damages witnesses, reports, and documentation for plaintiffs.  The preparation of this evidence suggests that, contrary to plaintiffs' assertion on appeal, they were indeed challenging, at least in part, their failure *to be promoted* and how this impacted their earnings.

Third, plaintiff's proposed theory of the case, filed on March 15, 2017, stated, in its introductory sentence, that "[t]his is a failure to promote case based on racial discrimination," but then stated, in conclusion, that plaintiffs "will demonstrate that [d]efendant engaged in unlawful discrimination . . . by not allowing [p]laintiffs to interview for a position to which they were qualified for [sic]."  The proposed theory also noted that Jaeger was hired "despite not even meeting the minimum requirements" for the Swartz Creek job.  *Plaintiffs themselves, therefore, were conflating the failure to be interviewed and the failure to be promoted.*[13]  This in turn supports the trial court's finding that the two claims were inextricably connected.  Surely if the failure to interview was the primary focus—or even one of the primary focuses—plaintiffs would have, in their proposed theory of the case, focused on others who were *interviewed* and not just on the one person (Jaeger) who was *hired*.

Lastly, the evidence from *plaintiffs themselves* was extremely weak in terms of damages for a "failure to be interviewed" cause of action.  While Dunn testified that he felt "defeated" and "hurt" when he did not get an interview, this bare statement must be read in the context of other parts of his testimony.  Plaintiffs' attorney asked Dunn why he was hurt about not getting an interview for the Swartz Creek position when he had not been upset about failing to obtain three prior promotions, and Dunn answered:

> The person that they selected for the position is Mike Jaeger.  I was more qualified.  Me and [Ross] was more qualified than him because he's from the

---

[11] The failure to be interviewed *was* mentioned in the complaint, but only in the "statement of facts" section.

[12] Plaintiffs did, *during trial*, ask for a verdict form encompassing a question about being interviewed "and . . . hired," but plaintiffs aver that they included this "hired" language solely to appease the trial court over its concerns that a failure to be interviewed cannot provide an independent cause of action.

[13] Plaintiffs admitted in their brief in support of their motion for a new trial that these proposed instructions were submitted *before* the trial court ruled in chambers that there was no separate cause of action for a failure to be interviewed.  Accordingly, plaintiffs cannot argue that, in preparing the instructions, they were influenced by the trial court's ruling.

engineer. It doesn't have nothing to do with him personally, but it's just the department that he was coming from . . . .

Dunn stated that he initiated the lawsuit because it "didn't sit right with [him]" that Jaeger was hired, given that Jaeger was "from the engineer department." He said that Jaeger did "not hav[e] the knowledge of running a garage." Plaintiffs' attorney asked Dunn what he wanted from the jurors, and he answered:

> I want them to listen to the case and hear everything that you need to hear and decide on if you think it's worth us being compensated for because of being deselected from somebody that wasn't qualified more than us [sic], me and [Ross], for the Swartz Creek position . . . .

Defense counsel asked Dunn if he had ever "heard Mr. Daly say or do anything other than not interview you that indicates he doesn't like black people," and Dunn answered, "No." He admitted that he did not know why Daly chose not to interview him—and had not asked Daly or anyone else for the reasons—but thought it was based on race because he believed that he and Ross were more qualified than Jaeger. Defense counsel asked if Dunn was "speculating" that Daly did not give him an interview because of his skin color, and Dunn replied, "That's how I feel." The following exchange occurred between defense counsel and Dunn:

> *Q.* Is it your position that Mr. Daly didn't want an African-American for the Swartz Creek position? Is that the position you're taking in this lawsuit?
>
> *A.* It's my position that I thought he just took me and [Ross] away from an interview and gave it to someone less qualified than us.
>
> *Q.* Okay, but he just took you and [Ross] away because he didn't like you and [Ross] or because you're black?
>
> *A. At the time, I felt race was an issue, but more importantly, it's Mike Jaeger not qualified over us.* [Emphasis added.]

Defense counsel also asked, "[D]o you have any information to believe that John Daly eliminated anybody [from the interview process] because of their skin color?" Dunn replied, "I felt that that's why he eliminated me and [Ross] because maybe because we wasn't engineers." Earlier in his testimony, Dunn had expressed his concern about engineers being interviewed for the Swartz Creek position, stating, "I thought to myself, wow, the engineers are really going to replace us, the regular workers that do the job every day."

This testimony is not supportive of damages based on racial discrimination during the interview process. Dunn did say that he was hurt about failing to be interviewed, but the gist of his testimony was *not* that he was hurt because of being discriminated against for his race. Instead, he was hurt because someone from the engineering department was interviewed and ultimately selected for the position. While it is true that the earlier panel of this Court found a genuine issue of material fact for trial regarding racial discrimination during the interview process, the relevant proofs *now* are what was elicited *at trial*, after the earlier Court of Appeals opinion.

-16-

Ross testified that it was painful for him to leave his position with the Road Commission, but he emphasized that his pain was the result of *not getting the job*. He said that "getting a foreman position, being recognized for your accomplishments, being recognized for your skills, it's an amazing feeling. So, it's the opposite when it doesn't happen." He said that he should have been given a promotion at the Road Commission. Ross's testimony with regard to damages connected to a "failure to be interviewed" cause of action is arguably even weaker than Dunn's, because Ross was plainly concerned about the fact that he did not get the job.

During closing arguments, plaintiffs' attorney stated:

> Through certain circumstantial evidence, plaintiffs will demonstrate [sic] that defendants [sic] engaged in unlawful discrimination based on race by not allowing plaintiffs to interview for the position that they were qualified for. This is our theory.

Plaintiffs' attorney was bringing the "interview" issue in front of the jury. If Ross and Dunn had suffered compensable humiliation, emotional distress, or other damages because of the failure to be interviewed based on what they perceived as racial discrimination, surely plaintiffs' counsel would have elicited this at trial, even knowing that the trial court had ruled that it was going to instruct the jury solely on the failure to promote.

A reasonable interpretation of the case as a whole is that the gravamen of plaintiffs' claim was the failure to be promoted, with the failure to be interviewed being simply a part of that claim. It almost seems disingenuous for plaintiffs to argue on appeal that the case was solely about a failure to be interviewed, when they were clearly preparing for some time for an expert on economic damages, who ultimately testified about the effects of not obtaining *the promotion*. This is simply not a case where the complaint and subsequent documents or proceedings were focusing on the humiliation or other harder-to-quantify types of damages related to being denied an interview.[14]

Viewing all the circumstances together, we find that it is a close question whether an instructional error occurred, but even if one did, failing to vacate the jury verdict would not be inconsistent with substantial justice. *Cox*, 467 Mich at 8.

## IV. CONCLUSION

In Docket No. 341908, we affirm. In Docket No. 341907, we affirm in part but remand for the trial court to (1) explain its reasoning for reducing the billing amounts for the date of June 15, 2017, and otherwise clarify its ruling regarding the "two attorneys" argument; and (2) make

---

[14] Various witnesses indicated that it was very common for a person to apply for promotions at the Road Commission, fail to obtain them, and later obtain a different promotion. The trial testimony did not support that the failure to be interviewed for the Swartz Creek position was in any way prejudicial toward plaintiffs' future chances for promotion at the Road Commission.

an apportionment of case-evaluation sanctions between the two plaintiffs.  No taxable costs, neither party having prevailed in full.  We retain jurisdiction.


/s/ Colleen A. O'Brien
/s/ Karen M. Fort Hood
/s/ Thomas C. Cameron

# Court of Appeals, State of Michigan

## ORDER

Ronnie Dunn v Genesee County Road Commission

Docket No.    341907

LC No.        13-100253-CD

Colleen A. O'Brien
Presiding Judge

Karen M. Fort Hood

Thomas C. Cameron
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 28 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, we direct the trial court to (1) explain its reasoning for reducing the billing amounts for the date of June 15, 2017, and otherwise clarify its ruling regarding the "two attorneys" argument; and (2) make an apportionment of case-evaluation sanctions between the two plaintiffs.. The proceedings on remand are limited to this issue.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ Colleen A. O'Brien

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

August 1, 2019
Date

Chief Clerk