*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF JASON A. BLACKWELL, by PENNY COLE, Personal Representative,

Plaintiff-Appellant/Cross-Appellee,

UNPUBLISHED
August 13, 2020

v

ST. MARY'S OF MICHIGAN, doing business as ST. MARY'S OF MICHIGAN HOSPITAL,

Defendant-Appellee/Cross-Appellant.

No. 346652
Saginaw Circuit Court
LC No. 15-028060-NH

Before: FORT HOOD, P.J., and JANSEN and TUKEL, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff Penny Cole, as personal representative of the Estate of Jason A. Blackwell, appeals as of right the trial court's order granting the motion of defendant, St. Mary's of Michigan, doing business as St. Mary's of Michigan Hospital, to strike the testimony of plaintiff's expert, Timothy Hawkins, and granting summary disposition in favor of defendant. The trial court found that Hawkins was qualified under MCL 600.2169 to provide expert testimony on the standard of care for defendant's hospital administrators in developing and implementing a Code Blue policy,[1] but that Hawkins's expert opinion was not admissible because it was not rationally derived from a solid foundation. Earlier, the trial court found that plaintiff's anesthesiology expert, Dr. Dennis Doblar, M.D., was not qualified under MCL 600.2169 to testify as an expert in support of plaintiff's hospital-administration claims. The trial court also dismissed plaintiff's nursing-malpractice claims for lack of evidence that any malpractice caused Blackwell's death. Plaintiff appeals these decisions. On cross-appeal, defendant appeals the trial court's decision that Hawkins was qualified under MCL 600.2169 to testify regarding the standard of care for defendant's hospital administrators. This appeal is being decided without oral argument pursuant to MCR 7.214(E)(1). We affirm in part, reverse in part, and remand for further proceedings.

---

[1] A Code Blue is the name given at defendant hospital to the response when a patient experiences respiratory distress.

# I. UNDERLYING FACTS

This case arises from the death of plaintiff's decedent, 30-year-old Jason A. Blackwell, on March 17, 2012, in the Intensive Care Unit (ICU) of defendant hospital after his tracheostomy tube became dislodged and several members of defendant's staff were not able to secure an airway.[2] Blackwell arrived at the hospital approximately a week earlier for treatment of multiple gunshot wounds. On March 15, 2012, Blackwell underwent surgery to repair a fracture of his mandible, which required that his jaw be wired shut. Before the surgery, Dr. Timothy Hackett, M.D., placed an open tracheostomy tube in Blackwell's trachea. At approximately 6:20 a.m. on March 17, 2012, Blackwell suffered respiratory distress. When the attending nurse, Sara Enser, R.N., was unable to rectify the situation by herself, a Code Blue was called, but multiple intervention efforts by defendant's medical and nursing staff were unsuccessful in securing an airway. Blackwell died at 6:44 a.m.

Plaintiff alleged malpractice against defendant hospital based on its development and implementation of its Code Blue policy, and additionally for nursing malpractice. Following discovery, defendant filed several motions for summary disposition challenging the qualifications of plaintiff's expert witnesses and the causation element of plaintiff's nursing-malpractice claims. The trial court's rulings on these motions form the basis for this appeal.

# II. EXPERT TESTIMONY OF TIMOTHY HAWKINS

Plaintiff argues that the trial court erred by ruling that the proposed trial testimony of Timothy Hawkins, plaintiff's hospital-administration expert, was not admissible because it was not reliable. On cross-appeal, defendant challenges the trial court's preliminary determination that Hawkins was qualified under MCL 600.2169 to provide testimony with regard to the standard of care for a hospital administrator. We conclude that Hawkins was not qualified to testify as an expert witness in this case, because in his deposition taken during discovery, Hawkins failed to establish his qualifications regarding the applicable local standard of care for hospital administrators. Consequently, we need not reach the issue of whether Hawkins's testimony would have been reliable.

## A. STANDARD OF REVIEW

"The trial court's decision regarding whether an expert witness is qualified is reviewed for an abuse of discretion." *Turbin v Graesser*, 214 Mich App 215, 217-218; 542 NW2d 607 (1995). "An abuse of discretion occurs when the decision resulted in an outcome falling outside the range of principled outcomes." *Hayford v Hayford*, 279 Mich App 324, 325-326; 760 NW2d 503 (2008). A decision on a close evidentiary question ordinarily cannot constitute an abuse of discretion, *Barr v Farm Bureau Gen Ins Co*, 292 Mich App 456, 458; 806 NW2d 531 (2011), but an erroneous

---

[2] Defendant hospital is a level II trauma center in Saginaw, Michigan. Defendant hospital is also a teaching hospital that is partially staffed by residents.

application of the law is by definition an abuse of discretion, *Gay v Select Specialty Hosp*, 295 Mich App 284, 292; 813 NW2d 354 (2012).

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint and is reviewed de novo. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205-206; 815 NW2d 412 (2012). This Court reviews a motion brought under MCR 2.116(C)(10) "by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). Summary disposition "is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). "Only the substantively admissible evidence actually proffered may be considered." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016).

## B. WHETHER HAWKINS IS QUALIFIED TO TESTIFY REGARDING THE STANDARD OF CARE FOR HOSPITAL ADMINISTRATORS

"A plaintiff in a medical malpractice action must establish (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016) (citation and quotation marks omitted). In general, "expert testimony is required in a malpractice case in order to establish the applicable standard of care and to demonstrate that the professional breached that standard." *Id*. (citation and quotation marks omitted). But an expert witness is not required "when the professional's breach of the standard of care is so obvious that it is within the common knowledge and experience of an ordinary layperson." *Id*. at 21-22 (citation omitted). Finally, "[t]he proponent of the evidence has the burden of establishing its relevance and admissibility." *Id*. at 22 (citation omitted).

"The proponent of expert testimony in a medical malpractice case must satisfy the court that the expert is qualified under MRE 702, MCL 600.2955 and MCL 600.2169." *Elher*, 499 Mich at 22 (citation and quotation marks omitted). MRE 702 and MCL 600.2955 address the reliability of a proposed expert's testimony, but MCL 600.2169 addresses the qualifications of the proposed expert witness. See MCL 600.2169; MCL 600.2955; MRE 702.

Before we can turn to the question of whether a witness meets the requirements to testify regarding the standard of care under MCL 600.2169 (which is based on his or her licensure and work experience), we must first determine the applicable standard of care and the expert's knowledge of it. In MCL 600.2912a, the Legislature codified the standard of care applicable to medical practitioners, meaning those individuals who engage in the practice of medicine for their profession. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 18-19; 651 NW2d 356 (2002). For purposes of MCL 600.2912a, "the practice of medicine" is defined as

the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts. [*Id*. at 20, quoting MCL 333.17001(1)(d).]

But when a medical malpractice case is brought based on the actions of someone other than a medical practitioner, like a nurse, then the common law standard of care applies instead. *Id*. at 20.[3] Hospital administrators engage in administrative activities such as reviewing staffing at hospitals and writing and implementing procedures for specific events, such as the Code Blue in this case. As such, they are not engaged in the practice of medicine and thus the common law standard of care applies to them. See *id*. For medical malpractice cases, when the common law standard of care applies, "the applicable standard of care is the skill and care ordinarily possessed and exercised by practitioners of the profession in the same or similar localities." *Id*. at 21-22. Thus, an expert in hospital administration must be knowledgeable of the standard of care in the relevant locality to be qualified as an expert in a medical malpractice case. See *id*. at 20-22.

In his deposition, Hawkins testified about a national standard of care, not the local standard of care for a level II trauma center in Saginaw, Michigan, such as defendant. Specifically, Hawkins based his standard of care testimony on the national standards set by the Joint Commission.[4] Hawkins had never worked in a hospital in Michigan and he also conceded that he did not contact any local hospital administrators in the Saginaw area, or any other health system in Michigan, when preparing his opinion in this case. Additionally, Hawkins also conceded that he never had primary responsibility for drafting a policy or procedure for ICU management. Furthermore, Hawkins had never worked in a level II trauma center or in a teaching hospital staffed with residents, as is defendant. As such, Hawkins failed to establish that he was knowledgeable of the local standard of care for a level II trauma center in Saginaw, Michigan. Because Hawkins was not knowledgeable about the applicable standard of care, he was not qualified to offer standard of care testimony in this case. Consequently, the trial court erred by finding that Hawkins was

---

[3] As explained in *Cox*, the practice of nursing is different from the practice of medicine because the practice of nursing consists of

the systematic application of substantial specialized knowledge and skill, derived from the biological, physical, and behavioral sciences, to the care, treatment, counsel, and health teaching of individuals who are experiencing changes in the normal health processes or who require assistance in the maintenance of health and the prevention or management of illness, injury, or disability. [*Cox*, 467 Mich at 19, quoting MCL 333.17201(1)(a).]

[4] The Joint Commission was founded in 1951 and accredits and certifies more than 22,000 hospitals around the United States. The Joint Commission also develops standards that focus on patient safety and quality of care.

qualified to offer standard of care testimony, and thus it is unnecessary for us to consider the additional question of whether his standard of care testimony would have been reliable.

### III. QUALIFICATIONS OF DRS. DOBLAR AND ALLEN AS HOSPITAL ADMINISTRATION EXPERTS

Plaintiff argues that the trial court also erred by concluding that Dr. Dennis Doblar, M.D., and Dr. Paul Allen, M.D., were not qualified to offer testimony on the standard of care in support of plaintiff's hospital-administration claims. We disagree.

As stated earlier, "[t]he trial court's decision regarding whether an expert witness is qualified is reviewed for an abuse of discretion." *Turbin*, 214 Mich App at 217-218. Additionally, a motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint and is reviewed de novo. *Joseph*, 491 Mich at 205-206.

As an initial matter, we note that the issue of whether Dr. Allen can testify regarding the standard of care for hospital administrators was not actually decided by the trial court. Nevertheless, to the extent defendant raises the issue here, we choose to address it and conclude that the issue is waived. "It is well established that a party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error. A waiver is a voluntary and intentional abandonment of a known right." *Braverman v Granger*, 303 Mich App 587, 608; 844 NW2d 485 (2014) (citations, quotation marks, and brackets omitted). Plaintiff conceded in her November 16, 2017 response to defendant's interrogatories that Dr. Allen was not qualified to testify about the standard of care for hospital administrators. Thus, the issue is waived. Consequently, only the qualifications of one of plaintiff's anesthesiology experts, Dr. Doblar, to testify about the standard of care for hospital administrators remains at issue.

Plaintiff argues that Dr. Doblar is qualified to testify about hospital administration under MCL 600.2169, which is entitled "Qualifications of expert witness in action alleging medical malpractice." But we need not address this issue because Dr. Doblar failed to demonstrate that he knows the applicable local standard of care for a hospital administrator at a level II trauma center in Saginaw, Michigan and, therefore, whether Dr. Doblar fulfills the requirements of MCL 600.2169 is irrelevant to whether he can testify as an expert about hospital administration in this case. To the extent Dr. Doblar testified about the standard of care applicable to hospital administrators, he only discussed the national standard of care. As such, Dr. Doblar failed to testify about the local standard of care in Saginaw, Michigan, which, as already noted, is the relevant standard regarding a witness's qualifications to testify as an expert regarding hospital administration. See *Cox*, 467 Mich at 20-22. Thus, Dr. Doblar is precluded from testifying about hospital administration in this case because he failed to establish knowledge of the applicable standard of care. See MRE 702.

### IV. NURSING-MALPRACTICE CLAIM

Plaintiff argues that in concluding that plaintiff had failed to present evidence of causation and accordingly dismissing her claims for nursing malpractice, the trial court erred. We agree.

As stated earlier, a motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint and is reviewed de novo. *Joseph*, 491 Mich at 205-206.

At issue here is whether, for summary disposition purposes, plaintiff presented sufficient evidence that the alleged breaches of the standard of care by defendant's nursing staff were causally linked to Blackwell's death. In *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004), in the context of deciding whether the evidence at trial supported the jury's verdict that the defendants' breach of the applicable standard of care caused the plaintiff's cerebral palsy, the Supreme Court held that under MCL 600.2912a(2), a plaintiff in a malpractice action is required to prove causation by a preponderance of the evidence standard. Describing proximate cause as a legal term of art, the Court explained that the term includes both cause in fact and legal, or proximate cause. *Craig*, 471 Mich at 86. The Court explained:

> The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. [*Id*. at 86-87 (citation omitted).]

Accordingly, "[a]s a matter of logic, a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries." *Id*. at 87. With regard to causation in fact, the plaintiff must present evidence that demonstrates that the injury would not have occurred "but for" the alleged act or omission. *Id*. Therefore, while a plaintiff is not required to prove that the alleged act or omission "was the *sole* catalyst" for the injuries at issue, evidence must be presented that would allow the jury to determine that the alleged act or omission was a cause. *Id*.

> It is important to bear in mind that a plaintiff cannot satisfy this burden by showing only that the defendant *may have* caused his injuries. Our case law requires more than a mere possibility or a plausible explanation. Rather, a plaintiff establishes that the defendant's conduct was a cause in fact of his injuries only if he "set[s] forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *A valid theory of causation, therefore, must be based on facts in evidence*. And while " '[t]he evidence need not negate all other possible causes,' " this Court has consistently required that the evidence " 'exclude other reasonable hypotheses with a fair amount of certainty.' " [*Id*. at 87-88 (citations omitted; emphasis added).]

Consequently, a plaintiff in a malpractice action must put forth evidence that draws a causal link between the alleged breach in the standard of care and the plaintiff's injuries. *Id*. at 90. Accordingly, to withstand summary disposition under MCR 2.116(C)(10) here, plaintiff was required to present evidence that causally linked the alleged breaches of the standard of care by defendant's nursing staff to the conditions that caused Blackwell's death.

During her deposition, plaintiff's expert witness on the nursing standard of care, Kaisa Ring, R.N., testified that defendant's nursing staff breached the standard of care by not removing Blackwell's entire tracheostomy tube to allow access to the stoma. In pertinent part, Ring testified:

> *Q*. So you believe as soon as a Code Blue is called, the first reaction should be to remove the entire [tracheostomy tube?]
>
> *A*. Yes. I would have removed it, yes.
>
> *Q*. And does the standard of care for a nurse require that they remove the [tracheostomy tube]?
>
> *A*. Me, as an [Intensive Care Nurse], would I have done that? Absolutely. I wouldn't have hesitated.
>
> *Q*. But excluding your own personal standard of care.
>
> *A*. Well, it's not even really my personal standard of care. If you don't take [the tracheostomy tube] out, your patient still doesn't have an airway, so you could do nothing and your patient dies, or you could take it out and have at least a chance.
>
> *Q*. So you believe it's within the standard of care of a nurse to remove the [tracheostomy tube]?
>
> *A*. Yes.
>
> *Q*. You have no criticisms from 6:15 to 6:20 for nurses, but you believe as soon as the Code Blue was called, it was indicated right then and there that the tracheostomy tube should have been removed?
>
> *A*. Yes, because at that point, [Blackwell's] [saturation levels] were in the 50s.

Ring further testified that after the tracheostomy tube was removed, the stoma should have been ventilated with an Ambu bag in an attempt to get air into Blackwell's lungs, and Blackwell should have been ventilated. According to Ring, if these steps did not help, and defendant's nursing staff was not seeing that Blackwell was immediately responding, "then call somebody, do something else." In Ring's words, "[t]he standard of care is really getting an airway as fast as possible, so whatever steps you need to take to do that." Ring testified that defendant's nursing staff breached the standard of care by waiting until 6:30 a.m., 12 minutes, until deciding to change out the tracheostomy tube. Ring explained that "[a]nything that delays that is just making your patient hypoxic for that much longer, and he'll lose brain function." Ring further testified as follows:

> *Q*. So you believe that from 6:20 to 6:26 for a nurse to continue to bag the patient in an attempt to oxygenate by bagging, that that's a breach of the standard of care?

*A.* Yes, because you're still not in an airway.

*Q.* Was it Nurse Enser's responsibility within the standard of care to remove the tracheostomy tube?

*A.* I wouldn't just fault her, but yes, it was her responsibility.

*Q.* Once she removed the tracheostomy tube what could she do to oxygenate the patient?

*A.* Put a mask over his face, put a mask over his stoma. She could do both at the same time. Technically the patient could have had a mask on his face the entire time that they were trying to bag the stoma.

When reminded that Nurse Enser, the attending nurse who was present when Blackwell first lost his airway, testified that she had never removed a tracheostomy tube before, Ring responded: "Nurses do trach care all the time. In fact, they're the ones responsible for that. I don't think that I've ever seen a physician do trach care." Ring also testified that Blackwell could have been nasally intubated to provide him with oxygen because his jaw was wired shut. When asked if Blackwell's prognosis would have been different if the steps she believed should have been taken were done, Ring responded, "Yes. It's hard to imagine trying to hold your breath for 20 minutes and then come out alive."

Ring clarified that all of the steps within the standard of care, including removing the tracheostomy tube, bagging the stoma, bagging Blackwell's mouth and nasally intubating him, were all steps that preceded Blackwell getting a "formal secured airway." In Ring's opinion, "[y]ou keep going until you exhaust all your possibilities." Ring believed that if all of these steps had been taken, an airway for Blackwell would have been secured. In Ring's words, "it's a priority to have an airway; because if you don't have an airway, none of the rest of the [steps that were taken] really matters."

At the outset of his deposition testimony, Dr. Allen acknowledged that he was not a nurse, and during the balance of his testimony he did not offer evidence concerning the standard of care for defendant's nursing staff. Dr. Allen did testify that in his work as an anesthesiologist, he has had to replace a tracheostomy tube in a patient. This could occur under circumstances in which the tracheostomy tube is not properly secured, and when the patient is moved, the tracheostomy tube can fall out. According to Dr. Allen, it is "not probable" for a tracheostomy tube to become dislodged merely from a patient coughing. Dr. Allen agreed that a tracheostomy tube can become dislodged if a patient is moved while attached to a ventilator and the person moving the patient is not being careful. When asked what opinion he intended to offer at trial, Dr. Allen responded:

The opinion I intend to offer is that this patient expired as a result of having his trach tube dislodged, and that it was nobody present who could, who was able to first understand the situation, and second to fix the situation, that there were several options, none of which were taken.

Dr. Allen also testified that "someone who is capable of fixing the problem" should have been on staff at defendant's hospital where fresh tracheostomies were performed "to manage them should something go awry."

In our opinion, Ring's testimony regarding how defendant's nursing staff breached the standard of care, taken together with Dr. Allen's testimony regarding how the failure of defendant's staff to appropriately intervene to secure an airway for Blackwell, and the reasonable inferences drawn from this evidence, all viewed in the light most favorable to plaintiff, demonstrate that genuine issues of material fact exist with regard to the causation element of plaintiff's claim of nursing malpractice. See *Allison*, 481 Mich at 425. Specifically, Dr. Allen testified that a tracheostomy tube is more likely to become dislodged when a patient is moved rather than simply as a result of a patient coughing. Viewed in the light most favorable to plaintiff, Dr. Allen's testimony can be seen as establishing that Nurse Enser may have dislodged Blackwell's tracheostomy tube when she moved him. Nurse Enser, as well as other nurses, were present after Blackwell's tracheostomy tube became dislodged. Dr. Allen testified that there was "nobody present who could" understand and "fix the situation," which he opined led to Blackwell's death. Consequently, based on Dr. Allen's testimony, if Nurse Enser or another person present at the Code Blue had been able to understand and fix the situation then Blackwell would not have died. Thus, viewed in the light most favorable to plaintiff, there is a dispute of material fact regarding whether Blackwell died as a result of nursing malpractice, because the evidence established a causal link between the alleged breaches of the standard of care by the nursing staff and Blackwell's death. In other words, factual disputes remain concerning whether, but for the nursing staff's failure to perform the interventions Ring testified were required by the standard of care, an airway would have been secured for Blackwell, thereby enabling him to survive the Code Blue. See *Craig*, 471 Mich at 86-87. Accordingly, the trial court erred by granting summary disposition as to plaintiff's claim for nursing malpractice.

Defendant also argues that plaintiff failed to present evidence that if defendant's nursing staff had performed the interventions that Ring testified were necessary to save Blackwell's life, Blackwell would not have died. Defendant claims that its nursing and medical physician staff did perform the interventions that Ring alleged were lacking, such as removing Blackwell's tracheostomy tube, and performing additional ventilation and suction measures as well as a cricothyrotomy, but these measures did not save Blackwell's life. Contrary to defendant's assertion, Dr. Shah testified that he did not remove Blackwell's tracheostomy tube. Rather, he attempted to use a tube exchanger to ensure that Blackwell's tracheostomy tube was not blocked while the nursing staff continued to ventilate Blackwell. Dr. Shah, along with defendant's nursing team, also performed a needle decompression to remove subcutaneous air from Blackwell's body. Nurse Patricia Longoria, R.N., also explained the steps she took to provide additional ventilation for Blackwell. Nurse Longoria further testified that defendant's nursing staff performed a cricothyrotomy and a needle decompression to remove subcutaneous air from Blackwell's body.

According to defendant, because Dr. Shah's actions were not successful in providing the needed ventilation and oxygen for Blackwell, the other interventions that Ring suggested should have been done, including "bagging the stoma, placing a mask over the stoma, or nasally intubating" Blackwell, would not have been successful either. Defendant contends that the alleged interventions identified by Ring "were essentially performed" and thus, "[m]ore likely than not,

the 'required' interventions could not have saved [Blackwell] because in reality he did not survive when these interventions were performed."

Defendant is correct that the evidence showed that defendant's nursing and medical staff undertook several interventions that were aimed at providing additional ventilation and oxygenation for Blackwell in order to save his life. The record also demonstrates that Ring has criticized defendant's nursing staff for not undertaking the appropriate measures to secure an airway for Blackwell and to provide oxygen for him. In our opinion, the divergence in the evidence creates genuine issues of material fact to be resolved by the trier of fact, not only with regard to determining what measures were in fact undertaken, but whether the measures were undertaken correctly, in a timely fashion, in the correct sequence from a medical standpoint, and whether the interventions reasonably likely would have saved Blackwell's life. Accordingly, defendant was not entitled to summary disposition of the nursing-malpractice claims under MCR 2.116(C)(10).

## V. CONCLUSION

We reverse the trial court's April 30, 2018 opinion and order granting defendant's motion for summary disposition as to plaintiff's nursing-malpractice claims; we affirm the trial court's May 3, 2018 supplemental opinion and order concluding that Dr. Doblar was not qualified to testify in support of plaintiff's hospital-administration claims; and we affirm the trial court's September 27, 2018 opinion and order to the extent that it dismissed plaintiff's hospital-administration claims on the basis of its conclusion that Hawkins's expert witness testimony was not reliable; however, we reverse the September 27, 2018, order to the extent that it dismissed plaintiff's entire cause of action, including her nursing-malpractice claims. We remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

/s/ Karen M. Fort Hood
/s/ Jonathan Tukel

-10-