*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CAROLE DEROVEN, as Personal Representative of
the ESTATE OF RONALD DEROVEN,

UNPUBLISHED
August 17, 2023

Plaintiff-Appellant,

v

No. 360190
Grand Traverse Circuit Court
LC No. 20-035505-NH

PATRICK T. GARTLAND, M.D., and GRAND
TRAVERSE RADIOLOGISTS, PC,

Defendants-Appellees,

and

LAWRENCE H. WARBASSE, M.D., and INDIGO
HOSPITAL MEDICINE,

Defendants.

Before: YATES, P.J., and BORRELLO and PATEL, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff, Carole DeRoven, as personal representative of
the Estate of Ronald DeRoven, (Ronald) appeals by leave granted[1] the trial court's order granting
summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) to defendants-
appellees, Dr. Patrick T. Gartland and Grand Traverse Radiologists, PC (GTR). For the reasons
set forth in this opinion, we reverse the trial court's grant of summary disposition and remand this
matter to the trial court for further proceedings consistent with this opinion.

---

[1] *Estate of Ronald Deroven v Gartland*, unpublished order of the Court of Appeals, entered June
16, 2022 (Docket No. 360190).

## I. BACKGROUND

This case arises from the death of Ronald DeRoven. Ronald originally presented to Munson Healthcare Grayling Hospital on January 14, 2017, at approximately 9:16 p.m., with complaints of a sudden onset of chest and abdominal pain. A CT angiography (CTA) scan[2] was performed while he was at Grayling Hospital. During the early morning of January 15, 2017, Ronald was transferred from Grayling to "Munson Medical Center" "for suspected NSTEMI," i.e., non-ST elevated myocardial infarction. Ronald had a consultation with James M. Fox, M.D., who arranged for Ronald to have a cardiac catheterization procedure the next day.

Dr. Gartland reviewed the CTA that was performed on January 14, 2017, and issued a final report, which contained the following findings: "Postoperative changes involve the stomach. Additional postoperative changes are noted within the bowel. Enlarged mesenteric lymph nodes are present. Minimal apparent swirling of the mesentery is likely related to the postoperative change. No dilated loops of bowel are noted."[3] Regarding the mesenteric swirling, Dr. Gartland believed it "is a common incidental finding, and two reasonable radiologists may not even report it in the study, particularly with the absence of other findings to suggest a volvulus on this examination."

Defendant Dr. Lawrence H. Warbasse, who is board-certified in internal medicine, testified that Ronald became his patient at "approximately 7:00 in the morning or shortly thereafter" on January 15, 2017. Dr. Warbasse met with Dr. Gartland because Dr. Warbasse was unsure of what Dr. Gartland meant by his finding of swirling of the mesentery, and Dr. Warbasse "was puzzled about [Ronald's] pain in his abdomen." Dr. Warbasse explained: "[M]y patient was having a heart attack while also complaining of abdominal pain. That can sometimes be caused by heart attack. But I was concerned that he might have ischemic bowel or some other abdominal pathology. So I went to review that with Dr. Gartland."

Dr. Warbasse testified about what he learned from his meeting with Dr. Gartland:

> What I found out from Dr. Gartland was that there was no acute bowel pathology to explain his pain unless somehow there was an occult malignancy. But the CT scan did not show anything that could explain the symptoms. There was no dissection, diverticulitis, evidence of gastric perforation. You know, the main arteries that supply the bowel were all perfused and open. So I proceeded along the lines of trying to work up malignancy and I ordered tumor markers on that morning. And I ordered stool for occult blood.

Dr. Warbasse further testified that Dr. Gartland "did not feel there was anything on the CAT scan that could explain [Ronald's] symptoms." Dr. Warbasse testified that though he "had considered ischemic bowel," he "felt that it was ruled out by the CAT scan."

---

[2] The parties refer to this test interchangeably, as a CT scan or CAT scan.

[3] The operative procedure referenced by Dr. Gartland was Ronald's gastric bypass surgery, which was performed in 2004.

Ronald underwent a cardiac catheterization procedure at approximately 1:02 p.m. on January 15, 2017. At 5:04 p.m., Ronald had a consultation with Christopher A. LaFond, M.D., who indicated in his report that after Ronald's cardiac catheterization, Ronald "developed some abdominal distention and his hemoglobin dropped." Dr. LaFond ordered a CT scan of Ronald's abdomen, which showed that Ronald had developed a volvulus and ischemic bowel. Ronald died four hours later at 9:31 p.m. on January 15, 2017.

On September 30, 2020, plaintiff filed a claim of medical malpractice against Dr. Gartland and GTR. Plaintiff alleged that Dr. Gartland failed to advise subsequent healthcare providers in charge of continuity of Ronald's care of Dr. Gartland's significant findings; failed to advise the necessity for prompt follow-up via a dedicated abdominal CT; and failed to notify Ronald or his significant other of significant findings. As relating to the medical malpractice claim against GTR, plaintiff alleged that GTR "is vicariously liable for the negligent acts and omissions described herein by [Dr.] Gartland who . . . was acting within the scope of his agency and/or employment with [GTR]." Lastly, as relating to the general negligence claim against GTR, plaintiff alleged that GTR failed to properly select, train, and monitor radiologists; failed to enact standard orders, policies, and procedures regarding radiologists; and failed to enforce standard orders, policies, and procedures regarding radiologists.

Plaintiff attached an affidavit of merit from Kendall M. Jones, M.D., who is licensed to practice medicine in the state of Texas and board-certified in radiology. Dr. Jones stated, in part:

> Dr. Gartland violated acceptable standards of radiological care by failing to advise subsequent healthcare providers in charge of continuity of Ronald's care that his significant findings of swirling of the mesentery and post-operative changes involving the bowel were consistent with bowel obstruction or volvulus and the necessity for prompt follow-up dedicated abdominal CT.

Dr. Jones' affidavit further stated, "As a result of . . . Dr. Gartland violating acceptable standards of care, further abdominal work up was delayed, bowel obstruction progressed, resulting in severe clinical symptomatology including bleeding and hypovolemic shock resulting in the patient's death." The following portion of Dr. Jones's deposition transcript explains why Dr. Gartland needed to specifically mention volvulus:

> Q. You . . . said that Dr. Gartland . . . violated the standard of care at least in part by not mentioning the possibility of volvulus to the clinician either through their note or conversations. Is that correct?

> A. Yes.

> Q. And am I also correct that the reason that you believe the standard of care requires that they mention volvulus is to raise the potential for ischemic bowel in the mind of the clinician?

> A. Yes.

Q. And . . . you want the clinician considering the possibility of ischemic bowel so that clinician can decide whether or not to do a clinical workup for ischemic bowel. Is that correct?

A. Yes, because in this case the clinician was falsely reassured that there was nothing significant on the images. And, therefore, they turned their attention away from the bowel.

Q. So, . . . when you boil it down, the standard of care requires the radiologist to report these findings in such a way so that the clinician at least considers the possibility of ischemic bowel. Is that fair?

A. Yes.

Defendants Dr. Gartland and GTR moved the trial court for summary disposition pursuant to MCR 2.116(C)(10). The trial court granted defendants' motion for summary disposition stating, in relevant part:

> Now, plaintiff's radiology expert has indicated that the standard of care for a radiologist reading a film of this kind, a CT/scan, he has to report that there was a swirl, which was there, but also to report that the swirl could lead to volvulus and ischemic bowel and they should investigate that. Now, the volvulus ischemic bowel was not present at the time, was shown not to be there at the time of the previous one, but I can't – and plaintiff's expert says that the radiologist must state that it can develop a volvulus, and the bowel ischemia that follows, and they do that so a clinician will be aware that that can happen and will be therefore tipped off to look into that concern.
>
> The summary disposition has been filed by plaintiff [sic] claiming that that omission, if we accept it as the standard of care, and . . . the report of Dr. Garland [sic] did not mention volvulus versus ischemic bowel and therefore according to plaintiff's expert, which we have to accept his version for purposes of this motion, according to plaintiff's expert that would be a violation of the standard of care. Defendant's [sic] summary disposition is that that wouldn't have made any difference whatsoever. That – that the clinician, Dr. Warbasse, did in fact know that and did consider it. And, sure enough, Dr. Warbasse did consider that and did know bowel ischemia was an issue, considered it and decided not to pursue it. As quoted in plaintiff's response, on Page 8, this is from Dr. Warbasse's deposition, starting at Line 15, of Page 18, Line 15, quote, I was concerned that he could have ischemic bowel but I had a CAT/scan report which did not show ischemic bowel and as Dr. Gartland pointed out all the arteries supplying the small bowel were open, there were not cut off signs. There was no reason to suspect ischemic bowel. So, Dr. Warbasse, the clinician, was managing Mr. DeRoven's care, did explicitly consider the ischemic bowel volvulus scenario, evaluated it and decided that was not something to be pursued at that time. So it appears Warbasse already knew and in fact did examine and consider that swirl could lead to volvulus and ischemic bowel, and that will be subject to a discussion at trial whether that was a mistake or

not and that's not part of this motion. But, Gartland not explicitly mentioning volvulus and ischemic bowel made no difference because Dr. Warbasse considered it, evaluated it, and decided not to pursue that option at that moment.

So I think under the circumstances there is no causation[.]

This appeal followed.

## II. ANALYSIS

On appeal, plaintiff argues that Dr. Gartland failed to report the correlation between the swirling of the mesentery and a volvulus in his report and in his discussion with Dr. Warbasse. But for Dr. Gartland's failure, plaintiff argues, Dr. Warbasse would have treated Ronald differently. Consequently, plaintiff argues, there is a genuine issue of material fact whether Dr. Gartland's failure to comply with the standard of care was a cause of Ronald's death.

Defendants argue that, aside from the dispute whether Dr. Gartland was required to use the term "volvulus" in his report or in his conversation with Dr. Warbasse, there is no issue of material fact that Dr. Gartland complied with the standard of care. Dr. Gartland reported his finding of a swirling of the mesentery and recommended a follow-up CT scan. According to defendants, Dr. Gartland's alleged failure to explicitly state that the swirling of the mesentery can develop into a volvulus was not a cause of Ronald's death. Defendants go on to argue that while Dr. Jones opined that a radiologist must communicate to a clinician that a swirling of the mesentery can lead to a volvulus to raise the possibility in the clinician's mind of the potential for an ischemic bowel, Dr. Warbasse testified that he understood that mesenteric swirling can be associated with a volvulus and that an ischemic bowel was in his differential diagnosis. According to defendants, it cannot be true that Dr. Gartland's alleged failure to comply with the standard of care caused a delay in the diagnosis and treatment of Ronald's ischemic bowel because the possibility of an ischemic bowel was considered by Dr. Warbasse.

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Ellison v Dep't of State*, 320 Mich App 169, 175; 906 NW2d 221 (2017). Summary disposition is proper under MCR 2.116(C)(10) if, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). This Court is liberal in finding genuine issues of material fact. *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

To establish a claim for medical malpractice, a plaintiff must establish (1) the applicable standard of care, (2) a breach of that standard by the defendant, (3) injury, and (4) proximate causation between the breach and the injury. *Woodard v Custer*, 473 Mich 1, 6; 702 NW2d 522 (2005), reh den 474 Mich 1201 (2005). A plaintiff's failure to prove any of these elements is fatal. *Cox v Bd of Hosp Managers for the City of Flint*, 467 Mich 1, 10; 651 NW2d 356 (2002).

In *Ykimoff v WA Foote Mem Hosp*, 285 Mich App 80, 87; 776 NW2d 114 (2009), this Court stated:

Our Legislature has defined the applicable causation standard for medical malpractice cases in MCL 600.2912a(2), which provides in relevant part: "In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." The general principles pertaining to causation in an action for medical malpractice were recently reviewed by this Court in *Robins v Garg (On Remand)*, 276 Mich App 351, 362; 741 NW2d 49 (2007):

> "Proximate cause" is a term of art that encompasses both cause in fact and legal cause. *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). "Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or 'but for') that act or omission." *Id.* at 87. Cause in fact may be established by circumstantial evidence, but the circumstantial evidence must not be speculative and must support a reasonable inference of causation. *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 496; 668 NW2d 402 (2003). " 'All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty.' " *Skinner v Square D Co*, 445 Mich 153, 166; 516 NW2d 475 (1994), quoting 57A Am Jur 2d, Negligence, § 461, p 442. Summary disposition is not appropriate when the plaintiff offers evidence that shows "that it is more likely than not that, but for defendant's conduct, a different result would have been obtained." *Dykes v William Beaumont Hosp*, 246 Mich App 471, 479 n 7, 633 NW2d 440 (2001).

If circumstantial evidence is relied on to establish proximate cause, the evidence must lead to a reasonable inference of causation and not mere speculation.

In this case, Dr. Jones testified that Dr. Gartland breached the standard of care by failing to relay the significance of the swirling and failing to discuss the possibility of volvulus. Plaintiff and defendants do not appear to dispute the breach of this standard of care for the purposes of this appeal.[4] Rather, the parties dispute whether Dr. Gartland's failure to discuss the potential of volvulus in his report was the proximate cause of Ronald's death.

On that issue, Dr. Jones testified that a radiologist must mention the finding of a swirling of the mesentery. Dr. Gartland did this; in his report of the CT scan of Ronald's abdomen and pelvis, he mentioned a swirling of the mesentery. But Dr. Jones also testified that, when there is a swirling of the mesentery, the radiologist must mention to the clinician the possibility of a volvulus. Dr. Gartland did not mention the possibility of a volvulus in his report of the CT scan,

---

[4] There is also no dispute that Dr. Gartland satisfied the standard of care in identifying the swirling of the mesentery and recommending a follow-up CT study.

-6-

nor is there any evidence that Dr. Gartland mentioned the possibility of a volvulus when Dr. Warbasse met with him. Dr. Jones explained that Dr. Gartland needed to inform Dr. Warbasse that swirling is associated with volvulus because "a clinician doesn't normally know what the word swirling means," and it is "incumbent on the radiologists to at least give the clinicians a chance to determine if they think this might be volvulus"

While the record reveals that Dr. Warbasse met with Dr. Gartland out of concern that Ronald may have had ischemic bowel, Dr. Warbasse also met with Dr. Gartland because Dr. Warbasse was unsure of what Dr. Gartland "was getting at" with his findings of swirling of the mesentery. Dr. Warbasse was asked during his deposition if "swirl sign by way of a CAT scan is . . . a known finding consistent with small bowel volvulus and mesentery ischemia." Dr. Warbasse responded, "I was not sure what Dr. Gartland was getting at by that which was why I went to meet with him and asked him to explain his report to me."

From the record evidence, it is not clear whether Dr. Warbasse knew that swirling of the mesentery can be associated with small bowel volvulus either before or after meeting with Dr. Gartland. Instead, Dr. Warbasse testified that he found out, after meeting with Dr. Gartland, "that there was no acute bowel pathology to explain his pain unless somehow there was an occult malignancy. But the CT scan did not show anything that could explain the symptoms." Neither the final report from Dr. Gartland nor the progress notes from Dr. Warbasse indicated that the swirling of the mesentery may be associated with volvulus or that Dr. Gartland discussed this possibility with Dr. Warbasse. And although Dr. Warbasse did eventually explain in his deposition that swirling of the mesentery can be associated with small bowel volvulus, it is not clear from the deposition transcript whether Dr. Warbasse had that knowledge at the time that he treated Ronald. Because we must view the evidence in favor of plaintiff, we conclude that a genuine issue of material fact exists regarding whether Dr. Warbasse knew, at the time that he was treating Ronald, that swirling of the mesentery can be associated with small bowel volvulus. See *Dextrom v Wexford County*, 287 Mich App 406, 414-415; 798 NW2d 211 (2010): "[t]his question is unanswered by the documentary evidence and presents a genuine issue of material fact that must be addressed at trial."

What is apparent from the record is that following review of the CT scan with Dr. Gartland and learning from Dr. Fox that there was no occlusion of the arteries impeding the small bowel, Dr. Warbasse "ruled out" ischemic bowel. Dr. Warbasse testified that Dr. Gartland "did not feel there was anything on the CAT scan that could explain the patient's symptoms." After learning that there was no acute bowel pathology, Dr. Warbasse "proceeded along the lines of trying to work up malignancy and . . . ordered tumor markers on that morning. And [he] ordered stool for occult blood." Dr. Warbasse took no steps to do a clinical workup for volvulus or ischemic bowel.

Although Dr. Warbasse may have considered ischemic bowel based upon his clinical observations of Ronald, the record reveals that Dr. Warbasse did not receive the proper information from Dr. Gartland to determine whether the swirling was significant. As Dr. Jones opined, Dr. Gartland needed to note the swirling of the mesentery and communicate that swirling can be associated with volvulus, which would then allow Dr. Warbasse, the clinician, to "make sure that there is no clinical evidence of volvulus." Because Dr. Gartland did not relay the significance of the swirling, Dr. Warbasse "was reassured that there was nothing going on in the abdomen. And therefore, they directed their attention to the chest." In sum, there is a question of fact as to whether Dr. Gartland's failure to relay the significance of the swirling led Dr. Warbasse to believe that the

CT scan ruled out a diagnosis of an ischemic bowel. And, as Dr. Jones further opined, "[a]s a result, further abdominal work up was delayed, bowel obstruction progressed, resulting in severe clinical symptomatology including bleeding and hypovolemic shock resulting in the patient's death."

In sum, the record reveals, when viewing the evidence in a light most favorable to plaintiff, that reasonable minds could conclude that Dr. Gartland's failure to inform Dr. Warbasse that a swirling of the mesentery could lead to a volvulus and his stated belief that the CT scan showed nothing to explain Ronald's abdominal pain unless there was a malignancy, led Dr. Warbasse to conclude that the CT scan ruled out a diagnosis of an ischemic bowel. It was therefore error for the trial court to grant summary disposition in this matter.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiff having prevailed is entitled to costs. MCR 7.219(A).

/s/ Christopher P. Yates
/s/ Stephen L. Borrello
/s/ Sima G. Patel