*5 Corrigan, C.J.
In this medical malpractice case, we consider two issues: 1) whether a court may instruct a jury that it may find a hospital vicariously liable for the negligence of a “unit” of the hospital, and 2) whether MCL 600.2912a sets forth the standard of care for nurses in malpractice actions and, if so, which standard applies.
We hold that vicarious liability may not be premised on the negligence of a “unit” of a hospital and that substantial justice requires reversal. The “unit” instruction relieved plaintiffs of their burden of proof and did not provide the jury with sufficient guidance. For a hospital to be held liable on a vicarious liability theory, the jury must be instructed regarding the specific agents of the hospital against whom negligence is alleged and the standard of care applicable to each agent.
Further, we hold that the plain language of MCL 600.2912a does not prescribe the standard of care for nurses because they do not engage in the practice of medicine. Absent a statutory standard, the common-law standard of care applies. Under the common-law standard of care, nurses are held to the skill and care ordinarily possessed and exercised by practitioners of their profession in the same or similar localities.
i
FACTUAL BACKGROUND AND PROCEDURAL POSTURE
On February 8, 1990, Brandon Cox was bom at 26 or 27 weeks gestation, weighing approximately 900 grams. He was placed in the neonatal intensive care unit (nicu) of defendant hospital, and an umbilical arterial catheter (uac) was inserted into his abdomen *6 to monitor his blood gases, among other uses. At 4:00 P.M. on February 10, Nurse Martha Plamondon drew blood from the UAC and repositioned Brandon. At 4:20 P.M., it was discovered that the uac had become dislodged, causing Brandon to bleed from his umbilical artery and lose approximately half his blood supply. No cardiac or respiratory alarm sounded. The events that followed are in dispute. Nurse Plamondon testified that she immediately applied pressure to stop the bleeding and summoned Dr. Robert Villegas, who ordered a push of 20cc of Plasmanate. Dr. Villegas did not recall the event. Nurse Plamondon also testified that she paged Dr. Amy Sheeder, a resident in the NICU. Dr. Sheeder ordered another lOcc of Plasmanate and 20cc of packed red blood cells. On February 11, Brandon was transferred to Children’s Hospital. On February 13, a cranial ultrasound showed that Brandon had suffered intracranial bleeding. He was subsequently diagnosed with cerebral palsy as well as mild mental retardation.
In 1992, plaintiffs filed this medical malpractice action against defendant and one of its doctors, Dr. Edilberto Moreno.[1] Plaintiffs presented expert testimony at trial that Nurse Plamondon and others had breached the applicable standard of care. Defendant offered expert testimony supporting a contrary view. Defendants argued that plaintiffs could not prove that the removal of the UAC caused Brandon’s injuries, as the injuries were not uncommon for infants bom at 26 or 27 weeks gestation. The judge ruled, over defense objection, that a “national” standard of care *7 applies to nurses and the other individuals alleged to have been negligent.
The jury found in favor of plaintiffs and awarded $2,400,000 in damages. Defendant moved for judgment notwithstanding the verdict, a new trial, or remittitur. The trial court found that little evidence of causation existed and ruled that it would grant a new trial unless plaintiffs accepted remittitur to $475,000. Plaintiffs appealed, and the Court of Appeals ordered the trial court to produce a detailed opinion indicating the basis for remittitur.[2] On remand, the trial court reversed the prior grant of remittitur and granted a judgment notwithstanding the verdict in favor of defendant, holding that plaintiff had failed to establish negligence on the part of any particular nurse or doctor.
Again plaintiffs appealed, and the Court of Appeals reversed and reinstated the original jury verdict.[3] The Court held that sufficient circumstantial evidence of negligence existed and that defendant had not preserved its arguments by filing a cross-appeal. Defendant then filed a cross-appeal, which was dismissed because defendant had not submitted a copy of the circuit court order. The circuit court then vacated the order granting judgment notwithstanding the verdict and reinstated the jury verdict. Defendant appealed, and the Court of Appeals held, over a dissent, that defendant’s appellate issues were not preserved *8 because it had failed to file a cross-appeal from the original circuit court order.[4]
Defendant appealed to this Court. We vacated the decision of the Court of Appeals and remanded for consideration of defendant’s issues.[5] On remand, the Court of Appeals again affirmed, over a dissent, in a published decision.[6] Defendant filed an application for leave to appeal to this Court. We denied leave to appeal.[7] We then granted defendant’s motion for reconsideration and granted leave to appeal.[8]
n
JURY INSTRUCTION
A
STANDARD OF REVIEW
We review claims of instructional error de novo. Jury instructions should include “all the elements of the plaintiff’s claims and should not omit material issues, defenses, or theories if the evidence supports them.” Case v Consumers Power Co, 463 Mich 1, 6; 615 NW2d 17 (2000). Instructional error warrants reversal if the error “resulted in such unfair prejudice to the complaining party that the failure to vacate the jury verdict would be ‘inconsistent with substantial justice.’ ” Johnson v Corbet, 423 Mich 304, 327; 377 NW2d 713 (1985); MCR 2.613(A).
*9 B
DISCUSSION
We hold that the trial court improperly modified SJI2d 30.01 by substituting “hospital neonatal intensive care unit” for the specific profession or specialties at issue. Further, we hold that the error requires reversal because failure to do so would be inconsistent with substantial justice.
When the trial judge discussed the jury instructions with the parties, he indicated that he would phrase SJI2d 30.01 “in [his] own way.”[9] The judge stated:
Well, I’m going to indicate that with respect to Defendant’s conduct, the failure to do something which a hospital with a neonatal intensive care unit would do or would not do. That’s the way I’m going to phrase this.
Defendant objected, requesting that the instructions state the standard of care “with regard to a neonatal nurse practitioner[10] of ordinary learning or judgment *10 or skill in this community or similar one.” Defense counsel contended that the case had focused on Nurse Plamondon and her responsibility regarding the uac and was not as broad as the entire unit. The judge overruled defendant’s objection.
When he instructed the jury, the judge significantly modified SJI2d 30.01, stating:
When I use the words professional negligence or malpractice with respect to the Defendant’s conduct, I mean the failure to do something which a hospital neonatal intensive care unit would do or the doing of something which a hospital neonatal intensive care unit would not do under the same or similar circumstances you find to exist in this case.
It is for you to decide, based upon the evidence, what the hospital neonatal intensive care unit with the learning, judgment or skill of its people would do or would not do under the same or similar circumstances.
In other words, the jury instruction as modified eliminated any reference to any particular profession, person, or specialty, substituting instead the phrase “neonatal intensive care unit.” The modified jury instruction also failed to differentiate between the various standards of care applicable to different professions and specialties.
The plaintiff in a medical malpractice action “bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any one of these elements is fatal.” Wischmeyer v Schanz, 449 Mich 469, 484; 536 NW2d 760 (1995). Crucial to *11 any medical malpractice claim “is whether it is alleged that the negligence occurred within the course of a professional relationship.” Dorris v Detroit Osteopathic Hosp Corp, 460 Mich 26, 45; 594 NW2d 455 (1999), citing Bronson v Sisters of Mercy Health Corp, 175 Mich App 647, 652; 438 NW2d 276 (1989). A hospital may be 1) directly liable for malpractice, through claims of negligence in supervision of staff physicians as well as selection and retention of medical staff, or 2) vicariously liable for the negligence of its agents. Id.; Theophelis v Lansing Gen Hosp, 430 Mich 473, 478, n 3; 424 NW2d 478 (1988) (opinion by Griffin, J.). Here, plaintiffs have not advanced claims of direct negligence on the part of defendant hospital. Therefore, defendant’s liability must rest on a theory of vicarious liability.[11] Id. at 480.
Vicarious liability is “indirect responsibility imposed by operation of law.” Id. at 483. As this Court stated in 1871:
[T]he master is bound to keep his servants within their proper bounds, and is responsible if he does not. The law contemplates that their acts are his acts, and that he is constructively present at them all. {Smith v Webster, 23 Mich 298, 299-300 (1871) (emphasis added).]
In other words, the principal “is only liable because the law creates a practical identity with his [agents], so that he is held to have done what they have done.” Id. at 300. See also Ducre v Sparrow-Kroll Lumber Co, 168 Mich 49, 52; 133 NW 938 (1911).
*12 Applying this analysis, defendant hospital can be held vicariously liable for the negligence of its employees and agents only. The “neonatal intensive care unit” is neither an employee nor an agent of defendant. At most, it is an organizational subsection of the hospital, a geographic location within the hospital where neonates needing intensive care are treated. No evidence in the record suggests that the neonatal intensive care unit acts independently or shoulders any independent responsibilities. Therefore, because no evidence exists that the neonatal intensive care unit itself is capable of any independent actions, including negligence, it follows that the unit itself could not be the basis for defendant’s vicarious liability.
The negligence of the agents working in the unit, however, could provide a basis for vicarious liability, provided plaintiffs met their burden of proving (1) the applicable standard of care, (2) breach of that standard, (3) injury, and (4) proximate causation between the alleged breach and the injury with respect to each agent alleged to have been negligent. The phrase “neonatal intensive care unit” is not mere shorthand for the individuals in that unit; rather, plaintiffs must prove the negligence of at least one agent of the hospital to give rise to vicarious liability. Instructing the jury that it must only find the “unit” negligent relieves plaintiffs of their burden of proof. Such an instruction allows the jury to find defendant vicariously liable without specifying which employee or agent had caused the injury by breaching the applicable standard of care.[12]
*13 On this point, we agree with the Court of Appeals decision in Tobin v Providence Hosp, 244 Mich App 626; 624 NW2d 548 (2001). In Tobin, the trial court refused to modify SJI2d 30.01 to require the jury to determine whether each individual category of specialist who attended the decedent had violated the standard of care applicable to that specialty. Instead, the trial court instructed:
When I use the words “professional negligence” or “malpractice” with respect to the defendant’s conduct, I mean the failure to do something which a hospital’s agents/ servants/employees of ordinary learning, judgment or skill in this community or a similar one would do, or the doing of something which a hospital’s agents/servants/employees of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case.
It is for you to decide, based upon the evidence, what the ordinary hospital’s agents/servants/employees or [sic, of] ordinary learning, judgment or skill would do or would not do under the same or similar circumstances. [Id. at 672.]
The Court of Appeals found that the refusal to modify was error, stating:
*14 The unmodified standard instruction, under the circumstances of this case, was not specific enough; it permitted the jury to find that, for example, the nurse anesthetist violated the standard of care applicable to a critical care unit physician. The standard instruction is sufficient to inform the jury of the definitions of “professional negligence” and “malpractice” in the ordinary case involving one or two named defendants. However, in this case plaintiff chose to bring suit against the hospital and its (unnamed) agents, servants, or employees. Thus, it was incumbent on the trial court to ensure that the jurors clearly understood how they were to determine whether any of defendant’s employees committed professional negligence or malpractice under the particular standard of practice applicable to their specialty. The unmodified standard instruction did not fulfill that function. [Id. at 673.]
Similarly, in this case, plaintiffs did not name any specific agents of the hospital in their lawsuit at the time of trial.[13] Dr. Carolyn S. Crawford, an expert witness for plaintiffs, criticized the care of several agents of defendant, including a neonatologist, a respiratory therapist, a resident, and Nurse Plamondon.[14] The trial court’s “unit” instruction did not specify the agents involved, nor did it ensure that the jurors understood the applicable standards of care. The respiratory therapist, for example, may not be held to the standard of care of the neonatologist. The “unit” *15 instruction failed to ensure that the jury clearly understood 1) which agents were involved, and 2) that it could find professional negligence or malpractice only on the basis of the particular standard of care applicable to each employee’s profession or specialty.[15]
We hold that, in order to find a hospital liable on a vicarious liability theory, the jury must be instructed regarding the specific agents against whom negligence is alleged and the standard of care applicable to each agent. As stated above, a hospital’s vicarious liability arises because the hospital is held to have done what its agents have done. Here, the general “unit” instruction failed to specify which agents were involved or differentiate between the varying standards of care applicable to those agents. The instruction effectively relieved plaintiffs of their burden of proof and was not specific enough to allow the jury to “decide the case intelligently, fairly, and impartially.” Johnson, supra at 327. Under these circumstances, failure to reverse would be inconsistent with substantial justice.
HI
STANDARD OF CARE
Although we have already held that the erroneous “unit” instruction requires reversal, we will also address the applicable standard of care for nurses to provide guidance on remand.
*16 A
STANDARD OF REVIEW
This issue requires an interpretation of MCL 600.2912a. Questions of statutory interpretation are reviewed de novo. Oade v Jackson Nat’l Life Ins Co, 465 Mich 244, 250; 632 NW2d 126 (2001).[16]
B
DISCUSSION
In 1977, the Legislature enacted MCL 600.2912a, setting forth the standards of care for general practitioners and specialists. At the time of trial, MCL 600.2912a provided:
In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
(b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the commu *17 nity or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, plaintiff suffered an injury)[17]
The trial court held that a “general” standard of care applied to Nurse Plamondon, ruling that because Nurse Plamondon was not a party, the “local standard” could not apply. The court stated:
[I] still don’t consider that you look solely at the standard of care of the nurse, you look at the hospital’s standard of care which I consider a general standard.
=|: * *
[T]he standard of care of the hospital is always going to be an issue when the hospital is not a solely owned hospital owned by one doctor or by one person, and so it’s a general standard.
Defendant objected, arguing that nurses were not specialists and that a local standard of care applied. On remand, the Court of Appeals affirmed the trial court’s ruling, holding incorrectly that the issue was an evidentiary matter reviewed for an abuse of discretion.[18]
*18 The question, then, is whether nurses are held to the standard of care of a general practitioner or a specialist under MCL 600.2912a. We conclude that neither statutory standard applies. MCL 600.2912a, by its plain language, does not apply to nurses. The statute does not define “general practitioner” or “specialist.” When faced with questions of statutory interpretation, our obligation is to discern and give effect to the Legislature’s intent as expressed in the statutory language. DiBenedetto v West Shore Hosp, 461 Mich 394, 402; 605 NW2d 300 (2000); Massey v Mandell, 462 Mich 375, 379-380; 614 NW2d 70 (2000). Undefined statutory terms must be given their plain and ordinary meanings. Donajkowski v Alpena Power Co, 460 Mich 243, 248-249; 596 NW2d 574 (1999). When confronted with undefined terms, it is proper to consult dictionary definitions. Id.
Random House Webster’s College Dictionary (1997) defines “general practitioner” as “a medical practitioner whose practice is not limited to any specific branch of medicine.” “Specialist” is defined as “a medical practitioner who deals only with a particular *19 class of diseases, conditions, patients, etc.” “Practitioner” is defined as “a person engaged in the practice of a profession or occupation.” Therefore, for either subsection of MCL 600.2912a to apply, a person must be a “medical practitioner,” or engaged in the practice of medicine.
Nurses do not engage in the practice of medicine. MCL 600.5838a(l) provides that a medical malpractice claim may be brought against any “licensed health care professional.” MCL 600.5838a(l)(b) defined “licensed health care professional” as “an individual licensed or registered under article 15 of the public health code . . . .” Turning to the Public Health Code, MCL 333.17201(l)(c) defines “registered professional nurse” as
an individual licensed under this article to engage in the practice of nursing which scope of practice includes the teaching, direction, and supervision of less skilled personnel in the performance of delegated nursing activities.
MCL 333.17201(l)(a) defines “practice of nursing” as
the systematic application of substantial specialized knowledge and skill, derived from the biological, physical, and behavioral sciences, to the care, treatment, counsel, and health teaching of individuals who are experiencing changes in the normal health processes or who require assistance in the maintenance of health and the prevention or management of illness, injury, or disability.
In contrast, MCL 333.17001(l)(c) defines “physician” as “an individual licensed under this article to engage in the practice of medicine.” “Practice of medicine” is defined in MCL 333.17001(l)(d) as
*20 the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts.
As the above definitions demonstrate, nurses do not engage in the practice of medicine. Therefore, by its plain terms, neither subsection of MCL 600.2912a applies to nurses. To determine the applicable standard of care for nurses, we must turn to the common law.
Malpractice actions against nurses were not recognized at common law. Adkins v Annapolis Hosp, 420 Mich 87, 94; 360 NW2d 150 (1984); Kambas v St Joseph’s Mercy Hosp, 389 Mich 249, 253; 205 NW2d 431 (1973). The Legislature has, however, made malpractice actions available against nurses by statute. MCL 600.5838a. Although the Legislature created a malpractice cause of action against nurses, it did not enact an applicable standard of care. Therefore, we review the rules of the common law applicable to actions for medical malpractice for the standard of care.[19]
A survey of our case law reveals that the standard of care at common law was the degree of skill and *21 care ordinarily possessed and exercised by practitioners of the profession in similar localities. In 1896, this Court rejected a formulation of the standard of care that limited the scope to the individual's neighborhood, holding instead that the standard of care would be the ordinary skill in the individual’s locality or similar localities. Pelky v Palmer, 109 Mich 561, 563; 67 NW 561 (1896). In 1915, this Court pronounced that “all the law demands is that [the defendant] bring and apply to the case in hand that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances (Pelky, [supra]; Miller v Toles, 183 Mich 252 [150 NW 118 (1914)]).” Zoterell v Repp, 187 Mich 319, 330; 153 NW 692 (1915). In Ballance v Dunnington, 241 Mich 383, 386-387; 217 NW 329 (1928), we held that the standard of care of an x-ray operator was set “by the care, skill, and diligence ordinarily possessed and exercised by others in the same line of practice and work in similar localities.” See also Rubenstein v Purcell, 276 Mich 433, 437; 267 NW 646 (1936). In Rytkonen v Lojacono, 269 Mich 270, 274; 257 NW 703 (1934), we held:
The rule is firmly established that defendant was bound to use the degree of diligence and skill which is ordinarily possessed by the average members of the profession in similar localities.
We conclude that this common-law standard of care applies to malpractice actions against nurses. Therefore, the applicable standard of care is the skill and care ordinarily possessed and exercised by practitioners of the profession in the same or similar *22 localities. The trial court on remand shall instruct the jury regarding this standard.
IV
CONCLUSION
We conclude that to find a hospital liable on a vicarious liability theory, the jury must be instructed regarding the specific agents against whom negligence is alleged and the standard of care applicable to each agent. An instruction merely naming a unit of the hospital, without more, relieves plaintiffs of their burden of proof and does not comport with substantial justice. Further, we hold that MCL 600.2912a, by its plain language, does not apply to nurses. Instead, nurses are held to the common-law standard of care, i.e., the skill and care ordinarily possessed and exercised by practitioners of the same profession in the same or similar communities. Accordingly, we reverse the judgment of the Court of Appeals and remand to the trial court for a new trial.
Weaver,' Taylor, and Young, JJ., concurred with Corrigan, C.J.

 The parties stipulated to dismiss Dr. Moreno before trial.

 Unpublished order, entered December 14, 1994 (Docket No. 179366).

 Unpublished opinion per curiam, issued November 22, 1996 (Docket No. 184859).

 Unpublished opinion per curiam, issued April 6, 1999 (Docket No. 205025).

 462 Mich 859; 613 NW2d 719 (2000).

 243 Mich App 72; 620 NW2d 859 (2000).

 464 Mich 877; 630 NW2d 625 (2001).

 465 Mich 943; 639 NW2d 805 (2002).

 Unmodified, SJI2d 30.01 provides:
When I use the words “professional negligence” or “malpractice” with respect to the defendant’s conduct, I mean the failure to do something which a [name profession] of ordinary learning, judgment or skill in [this community or a similar one/name particular specialty] would do, or the doing of something which a [name profession] of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case.
It is for you to decide, based upon the evidence, what the ordinary [name profession] of ordinary learning, judgment or skill would do or not do under the same or similar circumstances.'

10 No evidence in the record suggests that Nurse Plamondon was a “nurse practitioner,” which is a specialized term used in nursing that refers to a registered nurse who receives advanced training and is qualified to undertake some of the duties and responsibilities formerly assumed only by a physician. See Merriam-Webster’s Collegiate Dictionary. The *10 only evidence presented at trial indicated that Nurse Plamondon was a registered nurse.

 Although plaintiffs’ first amended complaint contains numerous charges of direct negligence by defendant hospital, they offered no evidence of direct negligence at trial.

 Contrary to the dissent’s assertions, our holding does not increase plaintiffs’ burden or insulate defendants from liability. Rather, our holding *13 merely requires plaintiffs to establish which agent committed the negligence for which the principal is liable as required by agency principles and medical malpractice law. The dissent observes that no authority directly addresses the “unit” instruction given here, but our analysis is well-grounded in undisputed agency principles. The dissent acknowledges that a plaintiff must show that an agent of the hospital committed malpractice but provides no authority for its conclusion that a “unit” is considered an agent of a hospital. Further, the dissent cites no authority for its assertion that plaintiffs who are unable to establish which professional is negligent are somehow relieved of the requirement of proving a violation of the relevant standard of care by the particular agent for whom the hospital is to be held vicariously liable. No principle of law provides that plaintiffs are required to prove every element of their case unless is it “too difficult” to do so.

 Originally, the suit named Dr. Moreno, but the parties stipulated to his dismissal before trial.

 Justice Markman correctly observes that much of the evidence at trial focused on Nurse Plamondon, but plaintiffs presented evidence that other individuals were negligent as well. In fact, the trial court ruled that the “unit” instruction was proper because plaintiffs’ case included evidence that individuals other than Nurse Plamondon were negligent. Further, plaintiffs did not argue at trial that the res ipsa loquitur doctrine applied. Because evidence of negligence on the part of several individuals was presented, we cannot ascertain which individual the jury found to have been negligent. For this reason, the error was not harmless.

 Plaintiffs did not present evidence regarding every member of defendant’s Nicu; therefore, the dissent’s assertions that every member of the Nicu is a specialist and had a provider-patient relationship with Brandon are pure speculation.

 Further, we note that the applicable legal duty in a negligence or malpractice action is a matter of law. Morning v Alfono, 400 Mich 425, 438; 254 NW2d 759 (1977). The Court of Appeals erred in holding that the standard of care was an evidentiary matter reviewed for an abuse of discretion. Once the correct standard of care is determined as a matter of law, an appellate court reviews for an abuse of discretion a trial court’s rulings regarding the qualifications of proposed expert witnesses to testify regarding the specifics of the standard of care and whether the standard has been breached. Bahr v Harper-Grace Hospitals, 448 Mich 135, 141; 528 NW2d 170 (1995).

17 The statutory standards of care set forth in MCL 600.2912a are often referred to as the “general” or “local” standard of care for general practitioners and the “national” standard of care for specialists. See, e.g., Bahr, supra at 138. The term “national,” however, is not an accurate description of the statutory standard of care for specialists. The plain language of subsection (b) states that the standard of care is that “within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances.” MCL 600.2912a (emphasis added). Under the plain language of the statute, then, the standard of care for both general practitioners and specialists refers to the community.

 We note that before reaching the issue, the Court of Appeals held that defendant had forfeited the issue by not objecting until trial, relying on Greathouse v Rhodes, 242 Mich App 221; 618 NW2d 106 (2000). This Court has since overruled Greathouse, 465 Mich 885; 636 NW2d 138 *18 (2001), holding that “[t]here is no statutory or case law basis for ruling that a medical malpractice expert must be challenged within a ‘reasonable time.’ ”
Further, the Court of Appeals on remand again chastised defendant for failing to bring a cross-appeal, stating:
Accordingly, even if we were to conclude that defendant’s issues on appeal provided grounds for relief, we would sua sponte apply the unclean hands maxim to allow the trial judgment to stand. [243 Mich App 93.]
As the dissenting Court of Appeals judge noted, we stated in our remand order, 462 Mich 859, that defendant has “properly and persistently raised” the issues in its appeal. 243 Mich App 94. There is no merit to the Court of Appeals contention that defendant has “unclean hands” for failing to file a cross-appeal.

 The dissent characterizes our analysis as “outcome-determined.” On the contrary, we have endeavored to faithfully apply statutory rules of construction and the common law. Interestingly, the dissent itself cites no authority whatsoever for its novel legal proposition that a national standard of care applies to a “unit” of defendant’s hospital. No statutory or common-law basis for the dissent’s assertion exists. The Legislature has prescribed the standard of care for general practitioners and specialists, not for “units.” The common law does not address the application of a “national” standard of care for hospital “units.” The dissent appears to have created its preferred legal scheme out of whole cloth.