*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HUSSEIN KHALIL,

Plaintiff-Appellant,

v

ERIC Y. HSU, M.D., JORDAN FORD,
MEGAN PHILLIPS, and VHS
HARPER-HUTZEL HOSPITAL, INC., doing
business as HARPER-HUTZEL HOSPITAL,

Defendants-Appellees.

UNPUBLISHED
February 02, 2026
10:52 AM

No. 372772
Wayne Circuit Court
LC No. 23-000872-NH

Before: BORRELLO, P.J., and MARIANI and TREBILCOCK, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff appeals as of right the trial court's order granting defendants' motions for summary disposition and dismissing all of plaintiff's claims against all defendants. For the reasons set forth in this opinion, we affirm in part and reverse in part.

## I. BACKGROUND

This case arises out of a nerve injury to plaintiff's left arm that was allegedly suffered by plaintiff during an elective, robotically assisted bariatric surgery in 2020. The operation essentially involved a conversion from gastric lap band to Roux-en-Y gastric bypass for plaintiff, who was morbidly obese.

The operation was performed by Dr. Michael H. Wood as the primary surgeon, and Beth Garretson served as the first assistant nurse practitioner. Plaintiff was placed under anesthesia beginning at approximately 6:30 a.m. on the morning of the operation. At that time, nonparty Dr. Mohammed Ismail was the on-duty anesthesiologist, and it would have been Dr. Ismail who evaluated plaintiff, advised plaintiff of the risks of anesthesia, and took plaintiff to the operating room. Plaintiff was positioned for surgery by Dr. Wood, registered nurse (RN) Jeremy Gehner, RN Glynis Mason, and defendant certified registered nurse anesthetist (CRNA) Jordan Ford.

-1-

Plaintiff's right arm was in a tucked position at his side, and his left arm was secured to a padded arm board out to the side at an angle of less than 90 degrees with his palm facing up.

Defendant Dr. Eric Hsu started his shift at approximately 7:00 a.m. and took over as the anesthesiologist for plaintiff's operation. Dr. Hsu testified that when he took over, plaintiff was already intubated and positioned on the operating table. Plaintiff's left arm, which was untucked, was positioned on "egg crate padding" built into the arm board. The medical team placed a pulse oximeter on the left, untucked arm to continually assess the blood flow and oxygen saturation to the arm. The arm was secured in place on the arm board with two small Velcro straps over the palm, but there were no straps on the arm itself. Plaintiff's left arm was not under the surgical draping, so it was visible to the medical team during the surgery. The surgery began at 7:24 a.m., and concluded at 1:14 p.m., which was an unusually long time according to Dr. Hsu. He indicated that this type of surgery was usually completed within approximately 3½ to 4 hours.

Dr. Hsu testified that the surgeon provides the initial positioning of the patient and the patient's arms because the surgeon requires a certain layout for the robotic equipment and the surgical tools, and the anesthesiology team then checks to make sure the positioning complies with the standard of care. Dr. Hsu explained that this meant, as relevant to the present case, that the left arm was angled less than 90 degrees from the body, was resting on soft padding rather than a hard surface, and was facing forward with the palm up. These precautions were designed to prevent the median nerve and ulnar nerve from becoming entrapped.

According to Dr. Hsu, he was the anesthesiologist responsible for four operating rooms simultaneously that day, and it was his practice to check each room approximately every 15 to 20 minutes "if feasible." However, a CRNA was present with plaintiff at all times. Throughout the surgery, Dr. Hsu and the attending CRNA provided continuous assessment of plaintiff's extremities to prevent a positioning injury. These assessments included visual inspection of skin tone and monitoring vital signs. Although defendant Ford was the primary CRNA for plaintiff's surgery, defendant Megan Phillips also served as a CRNA for plaintiff, providing relief for Ford as necessary.

Plaintiff testified that when he woke up following surgery, he reported that his "arm felt like it was going to explode." In addition to the pain, plaintiff also initially experienced weakness in his left arm and a total loss of sensation. Medical records from treatment plaintiff received following the surgery indicated that he was experiencing decreased sensation in his median nerve and an initial diagnosis of carpal tunnel syndrome. However, approximately a month after surgery, plaintiff was evaluated by Dr. David Simpson at the Michigan Institute for Neurological Disorders, who concluded that there was evidence of a "SEVERE, median neuropathy at the antecubital fossa with acute/chronic denervation but no reinnervation." Dr. Simpson opined that the cause of the nerve damage was unclear, but he included a differential diagnosis that it was "compressive, ischemic." Plaintiff testified that he continues to experience a kind of constant "buzzing" or "electrical current" sensation in his left arm from the top of his shoulder all the way down his arm, radiating through his palm.

Dr. Hsu testified that plaintiff was at a greater risk for nerve injury during surgery because of his morbid obesity and the prolonged duration of the surgery, that the standard of care was followed, and that plaintiff's nerve injury was inevitable under these circumstances. Furthermore,

Dr. Hsu indicated that there was nothing more that he could have done and that there was "no way for me to either prevent or see any possible nerve injury that's happening."

Plaintiff filed the instant action, asserting two claims in his complaint. First, plaintiff alleged one count of medical malpractice against all defendants based on the individual medical practitioners' alleged breach of the applicable standards of care for anesthesiologists and CRNAs related to the positioning and monitoring of plaintiff during his surgery, which plaintiff alleged was a proximate cause of his nerve injury. Second, plaintiff asserted another count of medical malpractice against the hospital, alleging that the hospital was vicariously liable for the similar failures regarding plaintiff's positioning committed by the hospital's nonparty nursing employees, and any other RN that provided care to plaintiff.

Plaintiff retained three expert witnesses to testify about the applicable standards of care for the medical practitioners involved in this litigation. Neil Beuttner, Jr., CRNA, testified about the standard of care for certified registered nurse anesthetists. Beuttner testified that CRNA Ford breached the standard of care by (1) failing to properly support plaintiff's left arm with multiple straps, (2) failing to use a foam cradle and padding on top of plaintiff's arm, and (3) failing to periodically reposition the arm and the straps during surgery. Beuttner testified that his experience and education allowed him to conclude that plaintiff suffered a positioning-related injury. Beuttner testified that he did not see any evidence that CRNA Phillips, who was only involved in the operation briefly to relieve CRNA Ford for breaks, was involved in any positioning decisions or violated the standard of care relative to positioning.

Sara Dolt, RN, was retained to testify about the standard of care for registered nurses. She testified that watching for potential median nerve injury during the surgery required ensuring that nobody was leaning on the patient's arm in any way and ensuring that the patient's arm was not "abducted past 90 degrees on that armboard because that will stretch it, and the stretching will cause that." Dolt explained that the nurse's role with the anesthesiologist, CRNA, and surgeon was "collaborative" with respect to positioning the patient, and she testified that

> we make sure, if you are going to have four people up there positioning the patient, and you are there, I as a reasonable and prudent nurse, make sure that all my bony prominences are padded. I make sure that there is [sic] pulses present in the arms, legs, things like that, that makes sense for that particular surgery.

When she was deposed, Dolt also testified that because the nonparty nursing employees (Gehner, Mason, and Verble) were not deposed, she did not know what each individual nurse did during the surgery and thus was not able to identify any specific actions or inactions by the nurses that constituted a breach of the applicable standard of care for registered nurses in this type of surgery. Dolt admitted that median nerve injuries can occur in the absence of negligence, after which she testified as follows:

> *Q*. And, you know, expanding on that, just because a median nerve injury happens, it doesn't mean that a nurse or a physician, a surgeon, anesthesiologist was negligent, right?

* * *

-3-

*A.* It means that something didn't go right. They are not negligent, but clearly something wasn't done right.

*Q.* Well, I guess we are here to talk about negligence, right?

*A.* Yes.

*Q.* So why don't we -- why don't we go back to my question in terms of, you know, just because something happens in terms of a median nerve injury, doesn't mean that someone was negligent, as I understand your previous testimony; is that true?

\* \* \*

*A.* Really it's just not black and white. What we do is not black and white.

\* \* \*

*Q.* But you did agree with me earlier that median nerve injuries can and do happen in the absence of negligence, so I'm just expanding on that, but it seems like, you know, you already answered.

*A.* So yes they can, but quite obviously the person went in there without this and came out with it, so something was -- you know what I am saying? It's just not as black and white as yes or no, yes, they did something wrong, no, they didn't do anything wrong, because if you ask – if you ask -- I don't know how to put it. Never mind. That's what I can say.

After an off-the-record discussion, the parties decided to continue Dolt's deposition on a later date. Plaintiff's counsel noted for the record that Dolt was not prepared to give her final opinion regarding breaches of the standard of care because she was reserving the right to read the deposition transcripts of the nurses at issue, although she gave her opinion defining the relevant standard of care. Dolt was never recalled and the nonparty nurses were never deposed.

Next, Dr. Alan Kaye testified at his deposition about the standard of care applicable to anesthesiologists. Dr. Kaye opined that Dr. Hsu breached the standard of care by failing to periodically assess plaintiff's arm during the surgery by physically touching plaintiff's arm and checking for compression or stretch of the arm. According to Dr. Kaye, merely watching and observing the arm, as Dr. Hsu claimed to have done, was insufficient. Dr. Kaye further indicated that physically touching and assessing the arm would have revealed signs of stretching or compression, that conducting this kind of physical assessment was especially important with a morbidly obese patient such as plaintiff during such a long procedure, and that plaintiff's nerve injury would not have occurred had such an assessment been performed during the course of the operation.

-4-

With respect to causation, Dr. Kaye opined that that this type of nerve injury does not occur without a positioning issue and the failure to detect it through proper periodic physical assessments, thereby breaching the standard of care.[1] Dr. Kaye specifically disagreed with Dr. Hsu's testimony that the nerve injury was inevitable under these circumstances.

The trial court granted defendants' motions for summary disposition under MCR 2.116(C)(10). Specifically, the trial court concluded that plaintiff had failed to provide evidence of causation with respect to all defendants and that there were no facts in evidence from which plaintiff's expert nurse could testify about the alleged actions or inactions of the nurses. The trial court dismissed the action in its entirety. This appeal followed.

## II. STANDARDS OF REVIEW

"We review a trial court's decision on a motion for summary disposition, as well as the interpretation and application of the court rules, de novo." *Krieger v Dep't of Environment, Great Lakes, & Energy*, 348 Mich App 156, 170; 17 NW3d 700 (2023).

Here, defendants moved for summary disposition under MCR 2.116(C)(10). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). The trial court must consider the evidence submitted by the parties in the light most favorable to the nonmoving party. *Id*. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact," which exists "when the record leaves open an issue upon which reasonable minds might differ." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019) (quotation marks and citation omitted).

## III. NURSING MALPRACTICE CLAIM

Plaintiff first argues that the trial court erred by granting summary disposition in Harper-Hutzel Hospital's favor with respect to plaintiff's nursing malpractice claims. Plaintiff maintains that he established a genuine question of material fact whether the nurses breached their applicable standard of care.

In Count II of his complaint, plaintiff alleged that Harper-Hutzel Hospital was vicariously liable for the negligence committed by three of its employees, i.e., the nonparty registered nurses who participated in plaintiff's care. In *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 11; 651 NW2d 356 (2002), our Supreme Court held that a hospital may be held vicariously liable for the negligent acts of its agents. "[A] hospital's vicarious liability arises because the hospital is held to have done what its agents have done." *Id*. at 15. However, "[e]ven when the hospital is the only named defendant, the issue remains whether the hospital's agents violated the standard of care applicable to them." *Nippa v Botsford Gen Hosp*, 257 Mich App 387, 390; 668 NW2d 628 (2003).

---

[1] Dr. Kaye also acknowledged that the exception would be if there were a surgical error causing the nerve injury, of which there is no claim in this case.

"The plaintiff in a medical malpractice action bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Benigni v Alsawah*, 343 Mich App 200, 213; 996 NW2d 821 (2022) (citation and quotation marks omitted). The failure to establish any one of these four elements is fatal to a plaintiff's action for medical malpractice. *Id*.

At issue in the instant case is whether plaintiff provided evidence that the nonparty nurses breached the standard of care. "Generally, expert testimony is required to establish the standard of care and to demonstrate that the standard of care was breached." *Danhoff v Fahim*, 513 Mich 427, 432; 15 NW3d 262 (2024). See also *Gay v Select Specialty Hosp*, 295 Mich App 284, 292; 813 NW2d 354 (2012) (noting that the plaintiff was required to present expert testimony to establish the standard of care applicable to the nursing staff involved in the litigation). An exception to this general rule exists when "the professional's breach of the standard of care is so obvious that it is within the common knowledge and experience of an ordinary layperson." *Elher v Misra*, 499 Mich 11, 21-22; 878 NW2d 790 (2016).

Additionally, MCL 600.2169(1) provides, in pertinent part:

(1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

* * *

(b) . . . during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

(*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

"Although nurses do not engage in the practice of medicine, the Legislature has made malpractice actions available against any licensed healthcare professional, including nurses." *Cox v Hartman*, 322 Mich App 292, 300; 911 NW2d 219 (2017). Moreover, MCL 600.2169(1)(b) is not limited to physicians, and it "must be considered to apply generally to all malpractice actions, including those initiated against nonphysicians." *Cox*, 322 Mich App at 301 (quotation marks and citation omitted). Consequently, to establish the standard of care applicable to a registered nurse, a plaintiff's proposed expert witness must have devoted a majority of his or her professional time

in the preceding year to the active clinical practice of, or the instruction of students in, the health profession of a registered nurse. *Id.*

Here, plaintiff offered the expert testimony of Dolt, a registered nurse, to establish the standard of care for the nonparty nurses at issue in Count II. At her deposition, Dolt agreed that median nerve injuries of the type suffered by plaintiff "can and do happen in the absence of negligence." However, when pressed as to whether a nerve injury itself indicates that a nurse, physician, surgeon, or anesthesiologist was negligent, she responded, "It means that something didn't go right. They are not negligent, but clearly something wasn't done right."

For each of the nonparty nurses alleged to be negligent in Count II, Dolt testified that she was not able to identify whether the nurses breached the applicable standard of care because plaintiff's medical records only indicated what time the nurses checked in or out of the surgery. She confirmed that because she was not able to identify any actions or inactions that any of the nurses at issue took or failed to take during the surgery, she was not able to testify as to whether they breached the relevant standard of care.

In this medical malpractice action, plaintiff bears the burden of establishing "(1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Benigni*, 343 Mich App at 213 (quotation marks and citation omitted). Unless the breach is so obvious that it is within the common knowledge and experience of an ordinary layperson, plaintiff must establish the existence of a breach through expert testimony. *Elher*, 499 Mich at 21-22. While Dolt conceded that the nerve injury at issue may occur absent negligence, she equivocated and characterized the causation question as not "black and white." Her deposition was to be continued to permit review of the nurses' testimony for purposes of rendering an opinion on whether their conduct breached the applicable standard of care. However, plaintiff did not take the depositions of the nonparty nurses. Therefore, we are left with Dolt's testimony in which Dolt failed to identify any act or omission by the nurses constituting a breach of the standard of care. Nor does Dolt's testimony establish that plaintiff's injury could not have occurred absent negligence. Consequently, Dolt's testimony fails to provide a sufficient evidentiary basis to support a finding that the nonparty nurses breached the applicable standard of care.

Plaintiff's attempt to salvage his claims of nursing malpractice by relying on Dr. Kaye's testimony that such nerve injuries do not occur absent negligence is unavailing. Under MCL 600.2169(1) and *Cox*, 322 Mich App at 301, plaintiff must offer the expert testimony of a registered nurse in order to establish the standard of care applicable to registered nurses and to establish a breach of that standard of care. Dr. Kaye is not a registered nurse. Accordingly, his opinion cannot be used to establish that the registered nurses breached their standard of care. Vicarious liability of the hospital must be predicated on proof of negligence committed by at least one specific agent of the hospital. *Cox*, 467 Mich at 12, 15. On this record, there is no evidence that any specific nurse breached the applicable standard of care, and the hospital thus cannot be held vicariously liable for any alleged negligence of any of its nurses in this case.

Plaintiff also argues that summary disposition was premature because discovery was incomplete and plaintiff had not had the opportunity to depose the three nurses who were involved in plaintiff's surgery. Plaintiff's argument is disingenuous. As plaintiff acknowledged in the trial

court, discovery in this matter had already closed before the hospital filed its motion for summary disposition. Plaintiff also acknowledged that he did not seek to depose the nurses while discovery was still open. Instead, plaintiff filed a motion to compel the nurses' depositions after discovery was closed, and the trial court denied that motion. On appeal, plaintiff has not advanced any argument challenging the propriety of that ruling by the trial court. Because discovery had closed, plaintiff has failed to demonstrate that summary disposition was premature. *Glorycrest Carpenter Rd, Inc v Adams Outdoor Advertising Ltd Partnership*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 366261); slip op at 12. Moreover, "[m]ere speculation that additional discovery may uncover supporting evidence" is insufficient to avoid summary disposition. *Id*. at ___; slip op at 11.

Because plaintiff failed to demonstrate on the existing record that a material issue of fact existed as to whether the nonparty nurses breached the applicable standard of care, the trial court did not err by granting summary disposition with respect to plaintiff's claims of nursing malpractice.

## IV. PLAINTIFF'S PROOF OF CAUSATION

Plaintiff argues that the trial court erred in holding that the expert testimony that he presented was insufficient to establish that the alleged breaches of the standard of care committed by Dr. Hsu and Ford were the legal or "but for" cause of his injury.

## A. PROXIMATE CAUSATION AND RES IPSA LOQUITOR

In medical malpractice actions, the plaintiff must establish, among other things, that the alleged breach of the standard of care was a proximate cause of the injury at issue. *Benigni*, 343 Mich App at 213. MCL 600.2912a(2) further provides that "[i]n an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants."

"Proximate cause" is "a term of art that encompasses both cause in fact and legal cause." *Benigni*, 343 Mich App at 213 (quotation marks and citation omitted). This Court has explained the concept of cause in fact as follows:

> Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or but for) that act or omission. Cause in fact may be established by circumstantial evidence, but the circumstantial evidence must not be speculative and must support a reasonable inference of causation. All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty. Summary disposition is not appropriate when the plaintiff offers evidence that shows that it is more likely than not that, but for defendant's conduct, a different result would have been obtained. [*Id*. at 213-214 (quotation marks and citation omitted).]

With respect to legal cause, this Court has stated:

"[L]egal causation relates to the foreseeability of the consequences of the defendant's conduct[.]" "[P]roximate causation in a malpractice claim is treated no differently than in an ordinary negligence claim, and it is well-established that there can be more than one proximate cause contributing to an injury." "[T]he proper standard for proximate causation in a negligence action is that the negligence must be 'a proximate cause' not 'the proximate cause.' " [*Id*. at 214 (citations omitted; alterations in original).]

"As a matter of logic, a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries." *Craig v Oakwood Hosp*, 471 Mich 67, 87; 684 NW2d 296 (2004).

The trial court's explication of its summary disposition ruling demonstrates that it found Dr. Kaye's testimony insufficient to establish but-for causation. While the court also concluded that proximate causation was not demonstrated, its analysis omitted any consideration of foreseeability and rested solely on the determination that Dr. Kaye failed to establish that the nerve injury would not have occurred absent the failure to conduct physical assessments of plaintiff's arm intraoperatively. The court further reasoned that Dr. Kaye could not definitively ascertain whether the etiology of plaintiff's injury was nerve stretching or compression during the surgical procedure.

The trial court, however, erred by completely disregarding Dr. Kaye's testimony that nerve injuries of the type sustained by plaintiff do not occur absent improper positioning coupled with failure to detect such malposition through appropriate periodic physical assessments. Dr. Kaye testified that Dr. Hsu breached the applicable standard of care by failing to conduct periodic intraoperative physical assessments of plaintiff's arm, specifically through tactile examination to detect compression or excessive stretching. Dr. Kaye opined that visual observation alone—the method Dr. Hsu claimed to have employed—was inadequate to satisfy the standard of care. Dr. Kaye further testified that tactile examination would have revealed indicators of nerve stretching or compression, that such physical assessment was particularly critical given plaintiff's morbid obesity and the extended duration of the procedure, and that the nerve injury would not have occurred had a proper intraoperative assessment been performed. Dr. Kaye expressly rejected Dr. Hsu's contention that the nerve injury was inevitable under the circumstances.

To establish factual causation, "a plaintiff establishes that the defendant's conduct was a cause in fact of his injuries only if he set[s] forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Craig*, 471 Mich at 87 (quotation marks and citation omitted; alteration in original). The doctrine of res ipsa loquitur, however, "entitles a plaintiff to a permissible inference of negligence from circumstantial evidence." *Woodard v Custer*, 473 Mich 1, 6; 702 NW2d 522 (2005). Application of res ipsa loquitur requires a plaintiff to establish the following elements:

 (1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence;

(2) it must be caused by an agency or instrumentality within the exclusive control of the defendant;

(3) it must not have been due to any voluntary action or contribution on the part of the plaintiff; and

(4) [e]vidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff. [*Id*. at 7 (quotation marks and citation omitted; alteration in original).]

The "fact that the injury complained of does not ordinarily occur in the absence of negligence must either be supported by expert testimony or must be within the common understanding of the jury." *Id*. (quotation marks and citation omitted). Here, plaintiff provided expert testimony that the nerve injury at issue does not occur in the absence of negligence, at least relative to Dr. Hsu as the anesthesiologist through plaintiff's anesthesiologist expert, Dr. Kaye.

"In a proper res ipsa loquitur medical case, a jury is permitted to infer negligence from a result which they conclude would not have been reached unless someone was negligent." *Id*. at 7 (quotation marks and citation omitted). The res ipsa loquitur doctrine may be invoked to establish but-for causation where expert testimony establishes that the injury would not have occurred absent negligence, with the factfinder determining whether plaintiff has satisfied the preponderance standard that defendant's negligence caused the injury. *Jones v Porretta*, 428 Mich 132, 154-155, 157; 405 NW2d 863 (1987). "In cases where reasonable minds could differ as to whether this result could ordinarily happen 'but for' negligence, the plaintiff is entitled to have the case submitted to the jury, which, acting in its traditional factfinding role, will decide the liability issue." *Id*. at 155. Upon de novo review, we hold that plaintiff has submitted facts, which, if believed, would establish all four elements of the doctrine of res ipsa loquitur. Dr. Kaye testified that the type of injury suffered by plaintiff does not happen unless there was negligence. He further provided testimony that the standard of care required Dr. Hsu to properly position plaintiff's arm prior to surgery, and that absent Dr. Hsu's proper positioning coupled with his failure to detect such malposition through appropriate periodic physical assessments, plaintiff suffered injuries. Dr. Kaye testified that failure by Dr. Hsu to undertake these actions prior to surgery breached the applicable standard of care. Further testimony by Dr. Kaye raised genuine issues of material fact explicitly rebutting Dr. Hsu's contention that plaintiff's injuries would have occurred no matter what actions Dr. Hsu had taken.

On this record, plaintiff established a genuine issue of material fact as to whether Dr. Hsu breached the applicable standard of care. Dr. Kaye's testimony: "The improper positioning of the arm directly resulted from Dr. Hsu's oversight, which is a clear deviation from the accepted medical procedures," squarely contradicts Dr. Hsu's assertion that the injury would have occurred no matter what actions Dr. Hsu had taken. Accordingly, the trial court erred in granting summary disposition for Dr. Hsu.

We reach a different conclusion with respect to defendant Ford. Because Dr. Kaye's expert testimony ties negligence to Dr. Hsu alone but leaves Ford untouched, the claims part company. Dr. Kaye's testimony addressed the nexus between Dr. Hsu's breach and the plaintiff's injury, and not Ford's conduct. Plaintiff's appellate brief erroneously relies exclusively on Dr. Kaye's testimony to establish Ford's liability. For the reasons articulated regarding the nonparty defendant

-10-

nurses, plaintiff failed to proffer admissible expert testimony establishing Ford's breach of the applicable standard of care. Accordingly, we affirm the trial court's dismissal of defendant Ford.[2]

To the extent defendants assert alternative grounds for affirmance, we conclude these arguments are properly addressed by the trial court in the first instance.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction. No costs are awarded.  MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Philip P. Mariani
/s/ Christopher M. Trebilcock

---

[2] Plaintiff has failed to cogently articulate how the trial court erred with respect to the claim against Ford; accordingly, this issue is deemed abandoned. "It is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (quotation marks and citation omitted).